MAYER, Special Administrator, Respondent, vs. HIPKE and another, Appellants.

*January 17—April 8, 1924.*

*Physicians: Malpractice: Assisting surgeons: Degree of care required: Substance left in body during operation: Liability: Evidence: Sufficiency.*

1. In an action for malpractice brought against the family physician of deceased and the operating surgeon on the ground that during an operation a gauze pack had been left in the body of deceased, it is *held* that no liability as to the family physician was shown, there being no claim that he was negligent in recommending the operating surgeon and no evidence that he was guilty of a want of care while present in the operating room.    p. 389.

2. What constitutes ordinary care on the part of a physician assisting a surgeon in an operation is to be determined from the testimony of those who know what it is, and not as a matter of common knowledge.    p. 390.

3. A surgeon who has left a foreign substance in a patient's body during an operation cannot relieve himself of liability by showing that he followed the approved practice of the profession in his community.    p. 390.

4. The burden was on plaintiff to show to a reasonable certainty that the pack was left in the patient's body by defendant, evidence raising a suspicion or indicating a possibility not being sufficient.    p. 391.

5. Where it appeared that several years before the operation in question, which ultimately caused death, deceased had been operated on for appendicitis, and that gauze packing of a kind found in her body was customarily used in such operations, the evidence is *held* insufficient to warrant a finding that it was defendants who had neglected to remove such packing in the subsequent operation.    p. 394.

6. Where the gauze was found in the abdominal cavity and the operation performed by the defendants did not enter this field, no negligence can be predicated on the failure of the defendants to discover the gauze, in the absence of evidence that they had reason to suspect a foreign substance in such cavity.    p. 393.

APPEALS from a judgment of the circuit court for Washington county: C. M. DAVISON, Circuit Judge. *Reversed, with directions.*

Malpractice. The plaintiff and his wife, Catherine, were married in 1919. In the year 1917 she had undergone an operation for appendicitis, which was performed in the city of Milwaukee by some surgeon whose name does not appear. On November 13, 1919, she gave birth to her first child. The second child was born June 30, 1921, and, as far as the record discloses, both children are now living. After the birth of her first child she was sickly and did not feel well. On August 2, 1920, the defendant *Kauth,* the family physician, residing at Slinger, in Washington county, was called and attended her. The defendant *Kauth* became convinced that an operation was necessary and advised her removal to a hospital in Milwaukee. His advice was accepted and on August 7, 1920, she entered St. Joseph's Hospital, a hospital operated by the Franciscan Sisters, defendant in this action. It appears that the patient was left at the hospital for observation by *Dr. Hipke,* who was called into the case by *Dr. Kauth.* The time of the operation was fixed by *Dr. Hipke. Dr. Kauth* was notified and was present in his capacity as family physician. The operation was performed by *Dr. Hipke,* assisted by Dr. Foley. It was what is designated as an organized operation. The operating room and the appliances were prepared for use by the Franciscan Sisters, the person who gave the anæsthetic was supplied by the hospital as well as a surgical nurse and an assistant nurse, and there was present during the operation a surgical superintendent who had general oversight and supervision of the room. *Dr. Kauth* was present, but it was undisputed that he did nothing except what he was directed to do by *Dr. Hipke,* the chief surgeon. It appears without dispute that in the operation performed by *Dr. Hipke* the abdominal cavity was not entered. An incision was made on the right side. He went "through the skin, the muscle or the skin, the fat, the fascia and the muscles and down to the peritoneum." He did not enter the abdominal cavity in connection with the first or either of the two subsequent operations. The right kidney was found to be infected and it was removed. The

method of operation is described in considerable detail in the evidence, but it is not necessary to state all of the details here, since there is no claim made and there is no evidence to show that in the operation proper operative procedure was not followed, with the single exception hereinafter referred to. After the operation both *Dr. Hipke* and his assistant, Dr. Foley, examined the involved area carefully, a count was made by the nurses of the sponges, packs, and instruments used, the result recorded, and the count was found to be correct. The operation was performed on August 10, 1920. It does not appear exactly at what time the patient returned to her home. The wound closed at both ends, but did not close in the center. She became pregnant and gave birth to her second child on the 30th day of June, 1921. About that time the wound closed up, but after remaining closed for some three or four weeks it opened again in July, 1921, discharging a considerable amount of pus. *Dr. Kauth* was called to examine it and again advised that she be taken to the hospital in Milwaukee. *Dr. Hipke* was called, an examination was made, and a second operation was advised. Prior to her removal to the hospital she had suffered considerable pain. She did not improve, and a third operation was performed and a rib resected to relieve a pus condition in the pleural cavity. No complaint is made in regard to the third operation. At the time the second operation was performed *Dr. Hipke* made a thorough exploration of the field of operation, found a small pus cavity, established drainage by making a stab-out so that it drained from both ways, but the patient did not improve and finally returned home October 11th. After her return she recovered slightly but was for the most part obliged to remain in bed, and the wound discharged offensive pus. *Dr. Kauth* continued to call upon her. She died November 16, 1921. The husband described her condition as follows:

"During the last two weeks of her life she got chills and sweats. She got chills until she died. About five days or so before she died I dressed the wound and noticed some-

thing on the dressing. It looked like corned beef. Before that she had a little carrots and there was a little pus on there. I believe I also noticed a little cabbage. We reported that to *Dr. Kauth* when he called again. From that time on until she died we noticed those food particles on the dressing at the wound at times. We changed her a couple of times a day for the last couple of days. The dressing to cover the wound was made of gauze and cotton batten. During that time pus always came from the wound."

About two days before her death, her husband while dressing the wound

"noticed just like a fuzz there and I just took a cotton batten and let the water drop on there and wash it out. It wouldn't come out so I took a toothpick and I picked on there trying to get that away, but when she had to cough when I took that away, it stuck out not even half an inch. I didn't know what it was though, so I took hold with two fingers and pulled on there. She did not notice that. Then I had it out a little ways. I didn't know what to do. I knew that the doctor was not home so I pulled it out. There was a whole lot of pus came out after this was out and then afterwards the stool came out, it was open."

The article which the witness removed from the wound, known as Exhibit 3, is a gauze pack and was about seven or eight inches long and one and one-half inches in diameter, in the form of a roll. Two days after its removal the patient died.

This action was brought by the plaintiff to recover damages on the ground that the defendants were negligent. At close of plaintiff's case plaintiff consented to a nonsuit as to the Franciscan Sisters. The court refused to permit the nonsuit at that time. At the close of all the testimony there was a motion for a directed verdict by the Franciscan Sisters, which was granted upon two grounds: (1) that it was a charitable institution, and (2) that no negligence had been shown as to the other defendants. The issues were submitted to the jury upon a special verdict. The jury found:

(1) At the time of the performance of the operation,

August 10, 1920, the defendant *Dr. Hipke* left a gauze pack, known as Exhibit 3, in the abdomen of Catherine Mayer.

(2) That the gauze pack taken from the body of Catherine Mayer, and known as plaintiff's Exhibit 3, was the gauze left in Catherine Mayer's body by the defendant *Dr. Hipke.*

(3) That the defendant *Hipke* failed to exercise ordinary care.

(4) That such failure was a proximate cause of the injury to Catherine Mayer.

(5) That such failure was a proximate cause of the death of Catherine Mayer.

(6) That the defendant *Dr. Kauth* failed to exercise ordinary care at the operation on Catherine Mayer on August 10, 1920.

(7) That such failure was a proximate cause of the injury to and death of Catherine Mayer.

(8) That the defendant *Dr. Kauth* failed to use ordinary care in the diagnosis and treatment of Catherine Mayer.

(9) That such failure was a proximate cause of the injury to and death of Catherine Mayer.

(10) That $4,000 will reasonably compensate Catherine Mayer for the injuries she sustained as a proximate result of the negligence of *Dr. Hipke.*

(11) That $4,000 will reasonably compensate *Frank Mayer* for the death of his wife, Catherine Mayer, as a proximate result of the negligence of the defendant *Dr. Hipke.*

(12) That $1,000 will reasonably compensate Catherine Mayer for the injuries sustained by her as a proximate result of the negligence of *Dr. Kauth.*

(13) That $1,000 will reasonably compensate *Frank Mayer* for the death of his wife, Catherine Mayer, as a proximate result of the negligence of *Dr. Kauth.*

Suitable motions were made to preserve for review all of the questions considered here. Defendant's motions being denied, the plaintiff had judgment upon the verdict in favor of *Frank Mayer* against the defendant *Hipke* for $8,000 and against the defendant *Kauth* for $2,000. From that judgment the defendants *Hipke* and *Kauth* appeal. Other facts material in the consideration of the case will be stated in the opinion.

For the appellant *Hipke* there were briefs by *Freeman &
Bendinger*, attorneys, and *Arthur F. Belitz* and *McGovern,
Hannan, Devos & Reiss*, of counsel, all of Milwaukee, and
oral argument by *Mr. Belitz*.

For the appellant *Kauth* there were briefs by *Lines,
Spooner & Quarles*, attorneys, and *Willet M. Spooner*, of
counsel, and oral argument by *James T. Guy*, all of Mil-
waukee.

For the respondent there was a brief by *Lehner & Lehner*,
and oral argument by *Philip Lehner* of Princeton.

For the defendant Franciscan Sisters the cause was ar-
gued orally by *Arthur B. Doe* of Milwaukee.

The following opinion was filed February 12, 1924:

ROSENBERRY, J. It appears without controversy under
the facts in this case that at least two causes of action ex-
isted. Death was not immediate. Had Catherine Mayer
survived, she would have had a right of action against the
defendants *Hipke* and *Kauth*, if the allegations of the com-
plaint were true. If the negligence of defendants *Hipke*
and *Kauth* caused her death, her husband would be entitled
to recover the damages sustained by him.

Sec. 4256, Stats., provides:

"Every such action [for wrongful death] shall be brought
by and in the name of the personal representative of such
deceased person, . . . provided, *that if there be no cause of
action in favor of the estate of such decedent* and the person
or persons to whom the whole amount sued for and recov-
ered belongs, as above provided, shall be the husband, widow,
or parent or parents of the deceased, suit may at his or her or
their option be brought directly in his or her or their name
or names instead of being brought in the name of the per-
sonal representative of such deceased person."

The exception does not apply here for the reason that
there is in this case, if the allegations of the complaint are
true, a cause of action in favor of the estate of the decedent.
*Legault v. Malacker*, 166 Wis. 58, 163 N. W. 476.

*Frank Mayer* is described in the title of the case as special administrator of the estate of Catherine Mayer. It is very difficult to tell upon what theory the judgment was rendered. There is no attempt in the complaint to state but one cause of action, although it is clear that two existed and the case was to some extent treated as consisting of two causes of action, as is disclosed by the form of the verdict. There is no allegation in the complaint as to the appointment of the plaintiff as special administrator or that he sues in that capacity, although it does appear that a copy of letters of administration issued to him as special administrator of the estate of Catherine Mayer were introduced and received in evidence. That, however, does not remove the difficulty. There are no allegations in the complaint appropriate to a second cause of action or that would bind the plaintiff as administrator of the estate of Catherine Mayer.

While rules of pleading have in recent years been relaxed from their former strictness, there should be some compliance with the statute requiring a statement of facts constituting a cause of action. No recovery can be had upon two causes of action where but one cause of action is stated or attempted to be stated. It would be very difficult in this case to determine upon which cause of action, if any, the plaintiff recovered, assuming that the complaint be amended to show that he is the special administrator of the estate of Catherine Mayer, deceased. It is certain there could be a recovery upon but one cause of action in any event under the pleadings in this case. In the view that we take of the case we do not find it necessary to further consider this aspect.

We call attention in passing to the form of the verdict as rendered. The jury assessed against the defendant *Hipke* damages of $4,000 by reason of his negligence which caused the death of Catherine Mayer, and against *Dr. Kauth* for identically the same death caused by his negligence, $1,000.

They also assessed against *Dr. Hipke* damages on account of negligence for injury to Catherine Mayer, $4,000, and for the identical damages against the defendant *Kauth,* $1,000. It is quite apparent that the jury fixed upon these amounts as representing the degree of responsibility with which the defendants were respectively charged rather than the amount of damage sustained by plaintiff. The damages, if any, were equal in each instance, since under the verdict the negligence of each proximately contributed to the injury complained of. We call attention to the verdict, but do not find it necessary to dispose of the case upon this phase of it.

A thorough search of the record fails to disclose any evidence whatever upon which the failure of *Dr. Kauth* to exercise reasonable care can be predicated. There is no claim that he should have made an earlier diagnosis when called in August, 1920, nor is it claimed that his diagnosis was wrong or that he did not properly advise the removal of the patient to a hospital for observation and treatment. There is no claim whatever that he was in any way negligent in procuring or recommending the services of *Dr. Hipke,* who, so far as the record discloses, is an eminent surgeon of high standing and of a long and varied experience, nor is there the slightest evidence to show that he was guilty of any want of care while present in the operating room. He did not then nor at any time hold himself out as a surgeon, but was there in his capacity as family physician, did what he was told to do, and outside of that had no duties to perform. It is claimed that it was his duty to instruct the nurses to count the sponges and to direct the operation, but there is no evidence to that effect. Assertion, insinuation, argument, and innuendo cannot supply the place of evidence. When the nurses and physicians were assembled in the operating room of the hospital they were not there to prepare for a lawsuit but were engaged in an attempt to re-

lieve human suffering and save human life, and throughout this case there is not a scintilla of evidence to show that anything was done or omitted to be done that is usually and ordinarily done by surgeons exercising that degree of care, diligence, judgment, and skill which surgeons in good standing, of the same school of medicine, usually exercised in the same or similar localities like Milwaukee, under like or similar circumstances, having due regard to the advanced state of medical and surgical science at the time of the operation on August 10, 1920, except as hereinafter noted. On the contrary, the evidence excluding the presence of the pack discloses that both hospital staff and surgeons exercised the highest possible degree of care, both at the time of the operation in August, 1920, and at the second operation in 1921. Under the undisputed evidence in this case, if it should be established that the pack in question was left in the body of the deceased on August 10, 1920, *Dr. Kauth* can in no sense be held legally responsible therefor. Standards of duty for a family physician attending an operation under circumstances appearing in this case cannot be established by argument or assertion. What constitutes ordinary care in a case such as this is to be determined by the testimony of those who know what it is, not as a matter of common knowledge. *Krueger v. Chase,* 172 Wis. 163, 177 N. W. 510.

We come now to a consideration of the question whether or not there is sufficient evidence to sustain a verdict as to the defendant *Hipke.* It was held in *Paro v. Carter,* 177 Wis. 121, 188 N. W. 68, that a surgeon who has left in the patient's body a foreign substance cannot relieve himself from liability by showing that he followed the approved practice of the profession in his community.

There being no evidence of any failure on the part of *Dr. Hipke* to exercise due care in any other respect, we come down to the crux of this case: Is there evidence to sustain a finding that the pack in question was left in the body of

the patient by *Dr. Hipke?* It stands as an undisputed fact in the case that the pack was in fact taken from the body of the deceased. Before the pack was discovered discharge from the intestinal tract was observed, showing conclusively that at the time of the removal of the pack there was an opening from the abdominal cavity through the peritoneum to the orifice made by the incision. In this case the material of which the pack is composed gives no clue as to its origin. Had there been no appendical operation in 1917, in other words, had there been no opening into the body of the de-ceased prior to that made on August 10, 1920, the proof would be complete. The testimony in the case, however, leaves the question of whether or not the pack was intro-duced in 1920, or at the time of the appendical operation in 1917, in grave doubt. The burden is upon the plaintiff to satisfy the jury to a reasonable certainty that the pack was left in the body of the patient by *Dr. Hipke.* It is not suffi-cient for the evidence to raise a suspicion or to indicate a possibility. It must be sufficient to remove the controverted question from the field of doubt and speculation into that of reasonable certainty. The plaintiff relies on the testimony of two experts, Dr. Berwick and Dr. Ohswaldt. Their testimony is based very largely upon the assumption that the abdominal cavity was entered at the August 10, 1920, operation. It is to be noted that much of the testimony given by these experts would be applicable to either situation. The appendix, as is well known, lies in the abdominal cavity, the kidney lies without that cavity back of the peritoneum and is separated from the abdominal cavity by the peritoneal wall and fatty tissue. The undisputed testimony is that *Dr. Hipke* did not enter the abdominal cavity either on August 10, 1920, or at the time of the second operation. His field of operation was entirely without. While there is no evidence given as to the character of the appendical operation, the abdominal cavity must have been entered be-cause the appendix lies within that cavity. The evidence is

undisputed that packs of this kind are ordinarily used in appendical operations, or were in 1917, in the city of Milwaukee; such is the testimony of Dr. Hopkinson, a man of very large experience in this field, and it stands practically undisputed. It is further undisputed that when Exhibit 3 was removed from the body of the deceased the gauze was "grown into or rather held to the wall of the bowel," and Dr. Hopkinson further testified that it was impossible to exclude the fact that it might have been introduced at the time of the operation in 1917, by reason of "the presence of the pack on the same side, the involvement to the wall of the bowel, in the attachment of the pack, which bowel has removed from it the appendix." There was ample testimony to show that a sterile gauze such as this must have been, if it was used at the time of the appendical operation, might remain in the body of the patient for many years without creating any great amount of disturbance. The situation is further complicated by the fact that some process of deterioration had set up prior to August 10, 1920, as clearly indicated by the fact that the right kidney was infected. and that it contained a large amount of pus. It must be borne in mind at all times that the operation performed by *Dr. Hipke* was not and could not in the nature of the circumstances be a clean operation. Pus was present in large quantities at the time the operation was performed. The kidney was distended to three or four times its normal size. It also clearly appears from the testimony that this infectious process present in the kidney might well be transferred to other parts of the body. Dr. Hopkinson says:

"If this pack should have been placed in the abdominal cavity at the time of the appendical operation, it would be in front of the field of operation in which the removal of the kidney took place. The removal of the kidney would then bring into action the interposition of some tissues, a situation in which the gauze might be placed. That gauze, by the extension of the infection in the field from which the kidney was removed, became the site of the implantation or

extension of the infection. It would be likely to discharge the gauze through the point of least resistance, which might be into the field of operation for the removal of the kidney."

It is undisputed in this case that at the time of the third operation there was an area of infection in the pleural cavity at a point which had not been disturbed in either the appendical operation or in the operations of August 10, 1920, and August 22, 1921. The process by which infection is thus transferred from one part of the body to another is known as metastasis, and it is undisputed that it may take place in any direction and may affect any part of the body; that it is more likely to be transferred to some point already disturbed, but that this is not necessarily true.

It is claimed that the presence of the pack should have been discovered at the time of the second operation on August 22, 1921. The evidence upon this point as well as argument of counsel rests upon the assumption that it was left there during the kidney operation. There is no evidence to show that it was the duty of *Dr. Hipke* to explore an unopened abdomen in search of a supposititious foreign body. The testimony is the other way. It appears without dispute that *Dr. Hipke* at that time made a complete exploration of the field of the 1920 operation and found no pack or other foreign substance, but discovered a pus cavity, which he thought accounted for the continued presence of the discharge. He was also of the opinion, although it was not demonstrated, that the infection of the kidney was of a tubercular nature and that wounds under such circumstances frequently fail to heal or at least healing is long delayed. It is equally clear that it would have been unwise and improper for him to have attempted to explore the abdominal cavity under the circumstances. He had no reason to suspect the presence of a foreign substance in the abdominal cavity. To have made an exploratory incision would almost certainly have extended the area of infection into the abdominal cavity.

The testimony of Drs. Ohswaldt and Berwick relates al-
most entirely to the assumption that the pack was left in
the body of the patient after the operation of August, 1920,
and does not at all take into account the situation that would
have existed had the pack been in the body from the time of
the appendical operation in 1917. Their testimony, there-
fore, does not cover the situation in this case. It is true that
Dr. Ohswaldt says that it would have been impossible for
the pack to have remained in the body during that period of
time without giving trouble; this, in the face of the testi-
mony of other experts and of facts which are almost mat-
ters of common knowledge, raises no issue. It is well
known that foreign substances do remain in the human body
for a considerable period of time without giving any appre-
ciable amount of trouble. It also appears from the testi-
mony in this case that the result of the appendical operation
was such that the patient was doubtful that she had been
relieved, and complained of pain in the region of the ap-
pendix from the time of her marriage on. *Dr. Hipke* testi-
fies that she told him in giving her history that she had pain
there before leaving the hospital after the appendical opera-
tion.

We have carefully reviewed the evidence in this case. We
cannot state it in its entirety. We are convinced, however,
that no evidence offered and received in the case warrants a
finding to a reasonable certainty that the pack in question
was left in the body of Catherine Mayer at the time of the
operation on August 10, 1920. In the absence of a finding
to that effect, based upon proper evidence, there is nothing
to charge the defendant *Hipke* with negligence in any other
respect. In fact, no negligence is claimed which does not
depend directly upon the fact that the pack was left in the
body of the patient at the time of that operation. Upon the
whole evidence, a finding that the pack was left there in
1917 would have just as much support as a finding that it
was left there in 1920. We do not need to cite cases to the

elementary proposition that a verdict cannot rest upon mere speculation. The circumstances of this case are most unfortunate. Two little children have been deprived of a mother, a husband has lost his wife. A verdict charging that responsibility upon an experienced, careful, conscientious surgeon should be supported by evidence establishing the fact, or establishing facts from which it may be inferred, to a reasonable certainty. It cannot and it ought not to rest upon evidence which leaves the fact in the field of doubt, uncertainty, and speculation.

In the view we take of the case, other questions raised need not be considered.

*By the Court.*—Judgment appealed from is reversed, and cause remanded with directions to dismiss the complaint.

The respondent moved for a rehearing.

In support of the motion there was a brief by *Philip Lehner* of Princeton, attorney, and *P. H. Martin* of Green Bay, of counsel.

In opposition thereto there was a brief by *Arthur F. Belitz,* counsel for appellant *Hipke,* and *Freeman & Bendinger,* attorneys, and *McGovern, Hannan, Devos & Reiss,* of counsel, all of Milwaukee.

On April 8, 1924, the mandate was amended to read as follows:

*By the Court.*—As to the defendant *Kauth* the judgment of the circuit court is reversed, with directions to dismiss the complaint. As to the defendant *Hipke* the judgment of the circuit court is reversed, and cause remanded for further proceedings.