* Motion for rehearing denied, with $25 costs, on May 2, 1950. *Page 418 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 419 
Action was commenced by the plaintiffs against the defendants for alleged malpractice in diagnosis and treatment of a fracture of plaintiff Minnie Morrill's right humerus. Upon a verdict in favor of plaintiffs the court entered judgment against the defendants jointly and severally. From the judgment defendants appeal.
On November 27, 1947, plaintiff Minnie Morrill fell in the basement of her home, striking her right arm against a post. She called her family physician, Dr. Komasinski, who took her to the hospital for X rays. Anterior-posterior and lateral views were taken by the hospital technician, Sister Constance, at the direction of Dr. Komasinski.
On November 28th Dr. Komasinski and Dr. Wright, the roentgenologist in charge of the X rays at St. Mary's Hospital, examined the X rays together. Exhibit 3, one of the X rays taken on the 27th, disclosed a fracture of the greater tuberosity, an outer piece of the humerus to which muscles from the back and shoulder are attached.
On the 30th further X rays of the arm and shoulder were taken by Dr. Wright. When these were developed Dr. Wright and Dr. Komasinski examined them together. Then, with the consent of Mrs. Morrill, Dr. Komasinski called Dr. Bump into the case because of his greater experience and specialization in surgery. The three doctors examined the X rays together and decided upon the treatment to be administered. They concluded that the arm should be placed at right angles to the body with the forearm pointing straight upward, in a position described by the witnesses as ninety-degree abduction and one hundred eighty degree external, rotation.
Dr. Bump, assisted by Dr. Wright, and with Dr. Komasinski looking on, placed the patient's arm in this position and applied a plaster of Paris cast. The plaintiff was then sent home where Dr. Komasinski visited her at regular intervals. *Page 420 
On January 2, 1948, the cast was removed. Plaintiff continued to have pain and complained of inability to bring her arm down at her side. She consulted one Dr. Madson, an osteopath at Rhinelander. He took X rays of plaintiff's shoulder, one of which showed a hairline fracture of the shaft of the humerus just below the shoulder joint, which was described by the medical witnesses as a fracture of the surgical neck of the humerus. There was a displacement of the lower fragment of the humerus of about three eighths of an inch. From the end of this fragment a calcium deposit of about one-half inch had accumulated extending toward the glenoid.
Dr. Madson advised the plaintiff to see Dr. Burns at the Wisconsin General Hospital. She consulted him on January 22, 1948. Dr. Burns examined her and advised that he could administer a general anesthetic and by manipulating the arm determine whether the spicule of bone near the joint was causing a block which prevented the arm from coming into normal position; that if it did, he could operate immediately and remove the spicule.
Plaintiff returned to Rhinelander and was sent by Dr. Madson to Detroit to see Dr. John P. Wood, an osteopathic surgeon.
Thereafter plaintiff was asked by Dr. Komasinski to submit to examination by Dr. H. C. Schumm, an orthopedic surgeon at Milwaukee.
All of these physicians, together with Dr. M. L. Jones of Wausau, testified at the trial for defendants.
Dr. Wood and Dr. Madson testified for the plaintiffs.
Additional facts will be stated in the opinion.
The appellants raise several important questions:
1. Is an osteopath licensed to practice surgery a competent witness to express an opinion as to the degree of care and skill to be exercised by one licensed to practice medicine and surgery?
2. Is a Michigan osteopath and surgeon who is not licensed to practice in Wisconsin a competent witness?
3. Can a jury finding of malpractice be sustained on the testimony of such osteopaths in the face of undisputed testimony of the heads of the orthopedic departments of the University of Wisconsin and Marquette University medical schools?
Dr. H. H. Christopherson, a member of the Wisconsin state board of medical examiners for twelve years, testified that the examination required of those taking osteopathy and surgery was identical to the examination of those taking medicine and surgery, except that the osteopaths are not required to answer any questions on the subject of materiamedica. The basic sciences, knowledge of which is required of those licensed as surgeons, are diagnosis, pathology, physiology, and anatomy. He further testified that in those subjects the examinations given to the osteopath and the medical applicant are the same.
Since the state licenses allopaths and osteopaths to perform surgery, it must be regarded as a common field concerning which both may testify.
The rule that a licensee of one school of medicine cannot testify as to conduct of a person licensed in another school of medicine is not involved in this case.
Counsel for respondents cites Swanson v. Hood (1918),99 Wn. 506, 170 P. 135, and other cases to the effect that *Page 422 
so long as the witness is sufficiently acquainted with the doctrine of the school of the defendant, and if the premises from which he testifies are those of defendant's own school, the witness is not disqualified simply because he himself belongs to another school.
The question of whether a witness possesses sufficient knowledge to qualify as an expert is generally one for the trial court, and unless it appears that in its determination the trial court is guilty of an abuse of discretion, his ruling will stand.Anderson v. Eggert (1940), 234 Wis. 348, 291 N.W. 365.
Appellants contend that the court erred in permitting Dr. Wood, who was licensed to practice in Michigan but not in Wisconsin, to qualify as an expert.
The statute, which authorizes the admission of such testimony, includes experts from Michigan.
Sec. 147.14 (2), Stats. ". . . practitioners in medicine, surgery, or osteopathy licensed in other states may testify as experts in this state when such testimony is necessary to establish the rights of citizens or residents of this state in a judicial proceeding and expert testimony of licensed practitioners of this state sufficient for the purpose is not available."
So far as the record discloses, the plaintiff consulted Dr. Wood, as she did Dr. Burns, for the purpose of determining what course of treatment to follow. Under such circumstances the court had no duty to require plaintiff to consult other osteopaths in Wisconsin to obtain testimony.
That plaintiff was unable to obtain medical witnesses in her behalf appears clearly: She and her counsel advised the trial court that they consulted six or seven physicians and surgeons licensed to practice in Wisconsin, and were advised that the diagnosis and treatment accorded plaintiff by defendants were faulty but that they would not appear and testify.
Appellants argue that Dr. Wood had no knowledge of surgery as practiced in Rhinelander or similar communities in Wisconsin. He did have knowledge of practice in communities of a size and similarly comparable to Rhinelander in *Page 423 
the state of Michigan. There was no showing that the practice of surgery differs in the two states nor that surgeons in Wisconsin should be held to a less degree of skill or care than surgeons in similar communities in Michigan.
Dr. Madson's competency is challenged on the additional ground that he did not qualify as an expert. He testified that he did not consider himself competent to treat the fracture. This presents a closer question and the admission of his testimony might have been prejudicial error if, as counsel for appellants contend, this were a question of whether a jury verdict could be supported by testimony of osteopathic surgeons against undisputed testimony of physicians and surgeons. However, upon the entire record there is more evidence in the testimony of the medical witnesses to support the verdict of the jury than there is in the testimony of the osteopaths.
While it is true that each of the medical experts gave as his conclusions that the treatment afforded by the defendants was proper and that defendants were diligent in making their diagnosis, their detailed testimony does not support such conclusions.
Counsel for Dr. Komasinski laments the fact that a lay jury has the power to ultimately pass upon the skill of a surgeon. There may be a difference of opinion on the wisdom of such law, but the law is clearly established that the weight of the testimony of experts, as of other witnesses, is for the jury.
The testimony in this case was in great conflict. Dr. Burns testified that he did not think the one-eighth inch offset and the accumulation of callus on the so-called head of the spicule (which X rays Exhibits 5 and 9 show to be very close to the glenoid) would interfere with use of the arm. In the report which followed plaintiff's examination he said:
"Although her X ray shows a spur beneath the glenoid, it is thought she could be brought into position such that her arm would lay by her side and the internal rotation be corrected. *Page 424 
If this were not successful, an attempt should be made to remove the fragment of bone in the inferior capsule of the shoulder joint. It is thought her trouble is due as much to scar-tissue contractures as to bone block."
At no time before treatment did the defendants discover the fracture of the neck of the shaft.
From the testimony of Dr. Komasinski it appears that there were six X rays taken the first day, one of which was Exhibit 3 which disclosed the fractured tuberosity. He testified that they attempted to get X rays from the lateral view for the reason that in diagnosis of a fracture it is considered proper practice to get X rays not only from the front to the back but from the side; that it is considered both proper and necessary. He testified that they had no lateral or oblique views of plaintiff's arm. "We attempted those but we did not get any good films."
Dr. Schumm testified that it is necessary in diagnosis to have lateral and anterior-posterior views and he considers it desirable to have oblique views in addition.
The defendants explained that they were unable to get satisfactory pictures from the lateral because of the obesity of plaintiff. This the jury did not have to believe. Other clear pictures were taken after removal of the cast and while the plaintiff was as fat as at the time of injury.
Dr. Wood was of the opinion that the double fracture should be treated in a hanging cast, but never got around to explain what would become of the tuberosity in such event.
Dr. Schumm and the other experts produced by defendants testified that the purpose of placing the arm in abduction is to bring the shaft up into position next to the tuberosity so that it will attach by healing process and also apparently to close the shoulder joint so that the muscles will not pull the tuberosity up into the socket causing additional trouble.
Dr. Schumm testified that the consideration that would be given to the fracture of the surgical neck when accompanied *Page 425 
by a fracture of the tuberosity "would depend on the type of the fracture about the neck, — as to the degree of deformity as to what would be done." He stated:
"When you have as much separation as you have here, if there were to be too much overriding it would still be put in the same position with some traction on the elbow to keep the arm pulled out. With this degree of deformity or this degree we would not put it in traction because we feel that the position is satisfactory enough and would not in itself tend to cause any serious disability."
There was also testimony by the medical experts that with the arm in abduction, though in a cast, there would be a tendency for the shaft to drop at the point of fracture.
There was much additional conflict. Dr. Jones was of the opinion that the plaintiff was holding her arm out fifty to seventy degrees wilfully. It was also his opinion that surgery would not be advisable because of excessive calcification at the situs of injury and that surgery would of necessity disturb the joint and very probably cause additional calcification in the soft tissue surrounding the shoulder.
We have set out enough of the testimony favorable to the plaintiff to demonstrate that the jury was justified in concluding that careful diagnosis would have disclosed the fracture of the shaft and that proper treatment would then require some measure (traction or otherwise) to prevent displacement and overriding of the fragments.
Counsel for appellants rely strongly upon the case ofDeBruine v. Voskuil (1918), 168 Wis. 104, 109,169 N.W. 288, where the court said:
"The entire case here rests upon the testimony of a physician to the effect that he would have treated the fracture in another way. Physicians are not compelled to choose at their peril between two accepted methods of treatment."
In this case there was conflict between the experts for the plaintiffs and those of the defendants as to whether the *Page 426 
fracture should be treated in a hanging sling or partially abducted at thirty degrees, the arm supported by a large axillary pad, or abducted at ninety degrees in a cast.
Assuming that all three are accepted methods of treatment and that a doctor would not be liable for selecting any one, there is an additional factor present which distinguishes this case from the DeBruine Case, supra. There was testimony from which the jury could properly infer that having selected the ninety-degree position of treatment, if the doctors had discovered the fracture of the shaft, due care would compel the use of traction.
Counsel for appellants urge this court to take judicial notice of the teachings of the University of Wisconsin medical school and cites from many textbooks on surgery. This court cannot take judicial notice of a medical-school course. These texts were not offered in evidence in the trial court and we conclude that they are not properly before us.
Dr. Komasinski maintains that under Mayer v. Hipke
(1924), 183 Wis. 382, 197 N.W. 333, he cannot be held for malpractice because the entire responsibility was assumed by Dr. Bump. It was held in that case that a family physician who assisted in operating did not share responsibility with the surgeon who committed malpractice in the operation. The cases are not without similarities. The distinction between that and the instant case, however, is that here Dr. Komasinski participated in the diagnosis and continued in active charge of the case after the cast was applied. From the testimony of Dr. Schumm it could be inferred that within several weeks after the cast was applied good treatment would require the taking of X rays to determine position of the bones and progress of healing.
We are of the opinion that the liability of the doctors is joint and that the evidence amply supports the findings of the jury.
By the Court. — Judgment affirmed. *Page 427