135 So.2d 18 (1961)
Richard M. COUCH, D.O., Alan J. Snider, D.O., individually, and Alan J. Snider, D.O., d/b/a Suncoast Osteopathic Hospital, Appellants,
v.
Willis W. HUTCHISON, Appellee.
No. 2158.
District Court of Appeal of Florida. Second District.
November 3, 1961.
Rehearing Denied December 8, 1961.
*19 Maurice R. Schuh, St. Petersburg, and T. Paine Kelly, Jr., of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellants.
B.J. Masterson of Masterson, Meros & Lloyd, St. Petersburg, for appellee.
WHITE, Judge.
This is an appeal by the defendants below from a final judgment on a verdict awarding the plaintiff $78,000 damages in a malpractice suit. The plaintiff was employed as a linen service truck driver before his back injury occurred. His injury was diagnosed as a herniated intervertebral disc resulting from throwing a bundle of dirty linen up and into the truck. Several osteopaths were consulted and they referred him to the appellants, Richard M. Couch and Alan J. Snider, doctors of osteopathy and osteopathic surgeons. Dr. Courch was of the opinion that the plaintiff should have a laminectomy, i.e. removal of the ruptured intervertebral disc, and a fusion to solidify the joint structure in that area.
The laminectomy and fusion were undertaken contemporaneously in February 1959. In attempting to achieve the desired fusion, Dr. Couch used surgical screws without the use of live bone grafts. Several months later the plaintiff was not satisfied with the results and he went to Dr. Paul Wallace, an orthopedic surgeon in St. Petersburg, Florida. Dr. Wallace performed another operation, removed the screws and used live bone grafts.
The plaintiff filed his complaint charging the defendants with malpractice by (1) failing to resort to conservative therapy before operating; (2) using surgical screws without using bone grafts between the surfaces to be fused; (3) discharging the plaintiff as cured when he was in need of further treatment.
The plaintiff's recovery of judgment was predicated mainly upon the ground that the defendants negligently failed to use a graft of live bone in connection with the surgical screws in the operation. The plaintiff used three medical orthopedic surgeons from the West Coast of Florida to testify, one of whom had not examined the patient. All the experts agreed that there was a necessity for spinal fusion but they disagreed with Dr. Couch that the method he used was proper.
The defendant was the only osteopathic orthopedic surgeon practicing on the West Coast of Florida. One other qualified witness was in Miami and unavailable at the time of the trial. Dr. Couch had no other expert osteopathic surgeons from the West Coast of Florida to testify for him. In support of his views that his method of spinal fusion was proper and acceptable, the defendant offered the testimony of James M. Eaton, D.O., an osteopathic surgeon practicing in the Philadelphia Hospital of Osteopathy.
The proffer of Dr. Eaton's testimony included his general and special qualifications and experience. He had performed more than 2,000 spinal fusion operations and utilized more than 10,000 surgical screws in the method employed by Dr. Couch, and he purportedly was in position to authenticate the method used. His testimony would tend to show that the alleged negligent acts on the part of Dr. Couch were purposely performed and carried out by Dr. Couch in accordance with the method of spinal fusion that he studied at the Philadelphia College of Osteopathy.
Objections to Dr. Eaton's offer to testify were sustained by the trial court on the grounds that he was not licensed to practice in Florida and that his deposition stated he was not familiar with "orthopedic standards which prevail in St. Petersburg and the surrounding similar communities." The plaintiff thus invoked the so-called "locality *20 rule". The defendants contend on appeal that the exclusion of the testimony with reference to the training of Dr. Couch, and also with reference to the advisability of the screw facet orthrodesis as distinguished from other methods of spinal fusion, was prejudicial to their case inasmuch as the only other witness qualified as Dr. Eaton on these subjects was not available. The defendants further contend that the court should have permitted practitioners of their school of therapy and surgery to testify to the efficacy of the methods approved by that school regardless of the locality in which they practice.
In Baldor v. Rogers, Fla. 1954, 81 So.2d 658, 660, the Court said:
"As was said by the Supreme Court of Washington in Dahl v. Wagner, 87 Wash. 492, 151 P. 1079, 1080, `the courts cannot hold a defendant in a malpractice suit to the theory of the one (opinion of physicians on a set of facts) to the exclusion of the other (contrary opinion by other physicians)'. If the treatment used is approved by a `"`respectable minority of the medical profession'"' that would relieve the defendant of the charge of malpractice. The doctor is obligated only to use reasonable skill and he fulfills his obligation if he used methods approved by others of the profession who are reasonably skilled. * * *"
In 78 A.L.R. 697 at 698 the annotation reads:
"It is the established rule that, in an action for malpractice, a physician or surgeon is entitled to have his treatment of his patient tested by the rules and principles of the school of medicine to which he belongs, and not by those of some other school, because a person professing to follow one system or school of medicine cannot be expected by his employer to practice any other, and if he performs the treatment with ordinary skill and care in accordance with his system, he is not answerable for bad results."
In 70 C.J.S. Physicians and Surgeons, Section 44, p. 953, the text reads:
"A school of medicine relates to the system of diagnosis and treatment. While the law recognizes that there are different schools of medicine, it does not favor, or give exclusive recognition to, any particular school or system of medicine, as against the others. When a patient selects a practitioner of a recognized school of treatment he adopts the kind of treatment common to that school, or, as otherwise stated, he is presumed to elect that the treatment shall be according to the system or school of medicine to which such practitioner belongs. * * *"
And in 41 Am.Jur. 203, Physicians and Surgeons, Section 85:
"School of Medicine.  It is the general rule that a physician is entitled to have his treatment of his patient tested by the rules and principles of the school of medicine to which he belongs, and not by those of some other school, because a person professing to follow one system or school of medicine cannot be expected by his patient to practice any other, and if he performs the treatment with ordinary skill and care in accordance with his school of practice, he is not answerable for bad results. This general rule has been applied to practitioners of the schools of homeopathy, allopathy, osteopathy, chiropractic, and Christian Science healing."
The appellee, however, contends that this case is controlled by the statement of the locality rule as set forth in Bourgeois v. Dade County, Fla. 1957, 99 So.2d 575, 577, 72 A.L.R.2d 391:
"(3) Admittedly the science of medicine is not an exact science. Physicians are not to be held liable for *21 honest errors of judgment. They are allowed a wide range in the exercise of their judgment and discretion. To hold one liable it must be shown that the course which he pursued was clearly against the course recognized as correct by his profession. On the other hand the attending physician must use the judgment and form the opinions of one possessed of knowledge and skill common to medical men practicing in the same or similar communities. Regan, Doctor and Patient and the Law, Sec. 39, p. 227." (Emphasis added.)
The same rule is similarly stated in 78 A.L.R. 697, on case analyses:
"One who holds himself out as a physician or surgeon whether licensed or not, and accepts employment as such to treat a patient, assumes toward the patient the obligation to exercise such reasonable care and skill in that behalf as are usually exercised by physicians and surgeons of good standing, of the same system or school of practice in the community in which he resides, having due regard to the condition of medical or surgical science at that time. * * *"
It is contended by the defendant that the above stated rule went out with the horse and buggy. In this connection there is a critical commentary in 12 Fla.L.Rev. 121 which states at page 122:
"In an ordinary negligence action, the standard of care of the reasonable man is determined by law, upon the facts of the case as found by the jury. Yet in medical negligence cases the standard has been set with few exceptions by one or more local doctors as expert witness, testifying in that particular case. Neither medical science nor nationally known authorities are called upon. The defendant's local colleagues, and not the law have fixed the standard of care. In this quasi-judicial role, they have been allowed the widest latitude. They have testified in every instance not as to the best practice but as to the local practice." (Emphasis added.)
A tendency to deviate from the locality rule is observed in 8 A.L.R.2d 772:
"In the days when there was little inter community travel the courts required personal familiarity with the practice of physicians in the particular community where the plaintiff was treated as the bases of the experts' testimony concerning the degree of care which should have been used, on the theory that a doctor in a small community or village, not having the same opportunity and resources for keeping abreast of the advances in his profession, should not be held to the same standard of care and skill as that employed by physicians and surgeons in large cities. But the reason for the earlier rule largely disappeared with the advent of present-day rapid methods of transportation and easy means of communication, broadening both the duty of the medical practitioner and the measure of the qualifications of the expert witness to testify as to that standard of care imposed upon the practitioner since there is now no lack of opportunity for the physician or surgeon to keep abreast of the advances made in his profession and to be familiar with the latest methods and practices adopted." (Emphasis added.) See also A.L.R.2d 1960 Supp. 557.
In those jurisdictions where the literal rule has been abandoned or modified it appears that the law still contemplates only that a physician shall exercise the skill and diligence of the average practitioner in the same or similar locality. Cases from some of the jurisdictions which have abandoned or modified the locality rule are: Cavaleso v. Sharp, R.I. 1956, 121 A.2d 669; Morrill v. Komasinski, 1950, 256 Wis. 417, 41 N.W.2d 620; McGulpin v. Bessmer, *22 Iowa 1950, 43 N.W.2d 121, 241 Iowa 1119; Sinz v. Owens, Cal. 1949, 205 P.2d 3; see also 8 A.L.R.2d 772; A.L.R.2d 1960 Supp. 557.
In Montgomery v. Stary, Fla. 1955, 84 So.2d 34, 39, the court suggests, obiter dicta, that the rule has lost its significance. In that case two doctors in Lake County, Florida, were charged with malpractice arising from the treatment for poor circulation of a newborn infant resulting in the loss of her fingers and thumb. The plaintiffs offered three expert witnesses who practiced in Chicago and who admittedly had never been to Florida and had no knowledge of the standard of care and diligence of the average practitioner in Lake County, Florida. The court said:
"Appellants next urge that the trial court erred in overruling their objections to testimony by three physicians from Chicago and its environs as to the propriety and acceptability of the treatment administered to the infant in this case, in the absence of a showing that they had practiced in a community similar to Lake County, Florida. The rule contended for, as stated by counsel for appellant Montgomery, is that `no expert testimony is admissible to show a failure on the part of a physician to employ a proper or acceptable treatment unless the expert is first qualified regarding his knowledge of the practice and treatment usually employed by physicians in the particular locality involved, or at least some similar community.' Appellees point out that this rule was originally formulated when communications were slow or virtually non-existent, and that it has lost much of its significance today with the increasing number and excellence of medical schools, the free interchange of scientific information, and the consequent tendency to harmonize medical standards throughout the country. We believe appellees' arguments to be well taken, but we do not in any event consider the rule to necessitate a reversal under the facts of this case. Of all of the testimony of the three Chicago doctors, (two testified by deposition and one, Dr. Nicholas, in person) only that of Dr. Nicholas, on proximate cause, was needed to sustain the verdicts of the jury. Proximate cause does not change with the locality. The jury could have found, as a matter of their own common knowledge and experience, and independent of expert testimony as to acceptable medical practice, that the fingers and thumb of a premature infant were needlessly burned off, and that this could not be considered acceptable medical practice in any community." (Emphasis added.)
The expression of the court in the foregoing case was to the effect that in any event the jury could have found as reasonable men that the hot towels applied to the infant's arm and hand were hot enough to cause the death of tissue to permit gangrene to set in rather than through poor circulation. However, the court did indicate, as stated, that the locality rule has largely lost significance.
It should be noted that the Montgomery case was decided prior to Bourgeois v. Dade County, supra, which stated the locality rule with approval. However, the latter case along with other recent Florida decisions cited by the appellee merely stated the rule as prescribing the minimum standard of care for a physician. These cases do not spell out particular methods nor do they deal with the admissibility of expert testimony to establish the existence of a recognized method or school of thought. It may be noted that the locality rule ordinarily is invoked to bar a plaintiff from using experts from another community to establish malpractice; but here the defendants sought to introduce testimony of a Philadelphia osteopath who had taught orthopedic surgery and performed *23 many of the same type of operations as Dr. Couch.
The apparent cause of difficulty with the locality rule has been the tendency in some cases to apply it as a rigid and exclusionary rule of evidence rather than as a definition of the minimum or average standard of reasonable care required of a practitioner. The rule has, of course, an appropriate relation to the admissibility of evidence; but persuasive argument can be made for not regarding the locality rule as a rule absolute describing the definitive means of measuring reasonable care in cases of alleged malpractice, whether of diagnosis, internal medicine, manipulative therapy or surgery. It takes a strange sense of logic to hold that local practice rules out all other evidence on the central issue of reasonable care on such a widely pervasive subject.
Inasmuch as the defendant Dr. Couch was entitled to be judged, at least in part, by the standards and practices of the professional school to which he belongs, it was necessary for him to offer witnesses to establish those standards and practices as distinguished from what might or might not be the operative practices or methods actually employed in the locality. It appeared that there were no other such osteopathic orthopedic surgeons in the area. Since the only other qualified expert from that school was unavailable, ex necessitate the testimony offered by Dr. Eaton should have been received in evidence. The exclusion thereof deprived said defendant of any expert testimony as to the approved standards of his school. Whatever may be the ultimate place of the locality rule in our juridical system, we hold that it can not be used to exclude evidence of the defendant Dr. Couch's qualifications with respect to the school in which he was trained.
In view of the error committed for which we must reverse, it is not deemed necessary to consider other questions raised on appeal and argued by counsel. The judgment appealed is reversed and the cause remanded for a new trial consistent with the views and holdings herein set forth.
Reversed.
ALLEN, Acting C.J., and KANNER, J., concur.