763 So.2d 82 (2000)
John FOSHEE and Dorothy Foshee
v.
TORCH OPERATING COMPANY and Lafayette Well Testing, Inc.
No. 99-1863.
Court of Appeal of Louisiana, Third Circuit.
May 17, 2000.
Rehearing Denied June 28, 2000.
*83 M. Terrance Hoychick, Young, Hoychick & Aguillard, Eunice, LA, Edward F. Bass, Lake Charles, LA, Counsel for Plaintiff/Appellant.
Robert M. Kallam, Voorhies & Labbe, Lafayette, LA, Counsel for Defendant/AppelleeLafayette Well Testing, Inc.
Ian A. MacDonald, Perret, Doise, Lafayette, LA, Counsel for Defendant/AppelleeTorch Operating Company.
Joseph B. Guilbeau, Joni A. Johnson, Juge, Napolitano, Guilbeau & Ruli, Metairie, LA, Counsel for IntervenorHalliburton Energy Services.
(Court composed of Chief Judge NED E. DOUCET, Jr., Judge SYLVIA R. COOKS and Judge MARC T. AMY).
AMY, Judge.
The plaintiff filed suit alleging injury as the result of an oilfield accident. A jury found that both the plaintiff and one of the defendant oilfield companies were legal causes of the accident. Seventy-five percent of the liability was apportioned to the plaintiff and the remaining twenty-five to the defendant oilfield company. Furthermore, the plaintiff was found to be the borrowed servant of the defendant who was found to be partially at fault. Although damages were awarded for past lost earnings and future lost earnings and earning capacity, the jury denied recovery for the remaining categories of damages. Due to the finding of borrowed servant status, the judgment dismissed the defendant from the suit without awarding damages. The plaintiff appeals. We affirm the dismissal, although for different reasons than that of the trial court.

Factual and Procedural Background
The accident at issue in this suit occurred just prior to or after midnight, on December 22-23, 1996, at a Torch Operating Company well site near Jasper, Texas. As was done the day before, Halliburton Energy Service, Inc. was contacted by Torch to "kill a well," a process whereby heavy fluids are pumped from the rig into the oil well. The pressure of the incoming *84 fluids suppresses those in the well, thereby "killing" the flow from the well.
The plaintiff, John Foshee, a service supervisor with Halliburton, arrived at the well site in a Halliburton pump truck. He was accompanied by Paul Buller, a service supervisor who was junior to Foshee and under his direction. Upon arriving at the site, Foshee first went to the trailer of Wayne "Snuffy" McCartney, a drilling foreman or "company man" for Torch. Foshee testified McCartney told him the well would be killed around midnight and that they should rig up. Foshee and Buller parked the truck and connected and prepared the lines required for the project. Foshee testified he informed McCartney when he was rigged up and, in turn, McCartney told him the lines needed to be tested before the well was killed and it should be tested at around 1000 to 1500 hundred pounds over the pressure of the well, which was around 4800 pounds. After this test, the pressure on the line was to be bled back and the well opened.
The nature of the events that followed these instructions is at issue. Foshee, who tended to the killing of the well from the control panel atop the pump truck, testified that he pressure tested the line by going up to 6500 pounds and that the bleeder valve on the line was closed. He stated that McCartney was at the foot of the ladder and that Buller, who was on the ground, began looking for leaks in the line. Buller reported to him that he found a leak. According to Foshee, McCartney was at Buller's side when he informed him there was a leak in the line. Because the leak needed to be repaired, Foshee testified that he then opened the bleeder valve, releasing pressure and emptying the fluids into the rig's displacement tanks. According to Foshee's version of events, he told Buller the pressure had been bled off. He stated he then looked into the tank and that there was an explosion. Due to fear, he jumped from the truck, allegedly injuring his knees. The explosion, according to the plaintiffs argument, occurred when McCartney signaled Randy Scarborough, an operator with Lafayette Well Testing, to open the well. When the pressure from the well was released with the bleeder valve open, the fluids blew back into the truck, causing the explosion.
According to McCartney, however, the events did not unfold as described by the plaintiff. Rather, McCartney testified he met with Foshee and Scarborough at the manifold, and informed Scarborough that the line would be pressure tested. Instead of one pressure test, however, McCartney testified there were two pressure tests. He stated that on the first one, he was atop the truck with Foshee and that a leak developed, a leak so obvious that he could see it. McCartney stated the pressure was reduced by opening the bleeder valve so that someone from Halliburton could change the leaking portion of the line. McCartney testified that during the time when the leaking swivel was being changed, he left the truck and went to the floor of the rig. He stated that he came back later, walked to the foot of the ladder, and Foshee told him "`I've got a test.'" McCartney stated that he responded: "`Real good. Are you ready to open the well?'" McCartney testified Foshee answered "`Yes'" and, due to this response, he turned to Scarborough and told him to open the well. Scarborough did so and the explosion occurred. In his testimony, Foshee denied telling McCartney he had a test or that the well could be opened.
Under either scenario, it is undisputed that Foshee jumped from the truck after the explosion. He stated he experienced a burning sensation in his knees at the time of the accident, but did not believe he was seriously injured. However, he contacted Halliburton on December 26, informing safety personnel that the pain was not improving and was worsening. He was advised to seek treatment at the emergency room. He did so on that same date and, on December 27, visited Dr. Lynn Foret, an orthopedic surgeon who advised *85 him that orthoscopic surgery would be required. He initially refused the surgery and returned to work, but in May, found the level of pain made his job duties difficult and underwent the first of three surgeries. He has not returned to work at Halliburton since that time.
Foshee filed this suit alleging that the negligence of Torch and Lafayette Well Testing caused his injuries[1]. Specifically, Foshee alleged that the explosion occurred as follows:
After the line was depressurized and before repairs were begun, representative(s) of Torch and/or Lafayette Well Testing, Inc. negligently opened and/or caused to be opened, valve(s) located on the choke manifold, which resulted in the line(s) connected to the Halliburton vehicle undergoing a rapid, dangerous and unexpected repressurization and which in turn resulted in the failure of line(s) and equipment located on the top of the Halliburton vehicle.
Foshee sought damages for past and future medical expenses, general damages, past lost wages, and future lost earnings and earning capacity.
In its answer to the petition, Torch asserted a number of affirmative defenses, including the defense that it is immune from tort liability as it was acting as Foshee's statutory employer at the time of the accident. Halliburton filed a petition of intervention seeking recovery for worker's compensation and medical benefits paid on the plaintiff's behalf.
The matter proceeded to trial in January 1999. The jury concluded that Torch was negligent in its duty to Foshee and its negligence was a legal cause of the accident. Torch was assessed with twenty-five percent of the fault. Foshee, too, was found to be negligent and was assessed with the remaining seventy-five percent of the fault. The jury determined that Lafayette Well Testing was not negligent in any duty owed to Foshee. The jury further found that Foshee was acting as Torch's borrowed servant at the time of the accident, an issue on which the jury was instructed as to Texas law. The jury went on to deny all damages except for those related to Foshee's earnings. The jury awarded $70,217.81 for past lost wages and $15,929.67 for future lost earnings and earning capacity. Due to the conclusion that Foshee was acting as a borrowed servant, however, the judgment subsequently rendered dismissed the plaintiff's claims against the defendants, thereby denying any damages to the plaintiff.
Foshee appeals assigning the following as error:
1. The Jury's Finding That Plaintiff Was the Borrowed Servant of Torch Operating Company Was Manifestly Erroneous.
2. The Trial Court's Failure to Grant Plaintiffs Motion for Directed Verdict Was Erroneous.
3. The Trial Court Erred in Dismissing Plaintiffs Suit Even if a Borrowed Servant.
4. The Jury's Finding of Comparative Fault on the Part of John Foshee was Manifestly Erroneous.
5. The Trial Court Erred in Assessing Any Fault on the Part of the Plaintiff Notwithstanding the Jury's Findings.
6. The Jury's Failure to Award Stipulated Medical Expenses and General Damages is Inconsistent with its Award of Economic Damages and is legal error.
7. The Trial Court's Failure to Render a Judgment Notwithstanding the Verdict was Error.

Discussion

Borrowed Servant
The plaintiff first contends that the jury erred in finding that he was acting as a *86 borrowed servant of Torch at the time of the accident. As part of this argument, he contends that the trial court erred in finding that Texas law on the issue of the borrowed servant doctrine applied rather than that of Louisiana. He points out that, although the accident occurred in Texas and Torch is a Texas corporation, both he and McCartney are Louisiana residents. The plaintiff argues that when the conflict of laws provisions of the Louisiana Civil Code are applied to these facts, analysis under Louisiana law rather than that of Texas is required. In addition to the choice of law issue, he further contends that the facts of the working relationship between Torch and Foshee, a Halliburton employee, do not support a finding that he was a borrowed servant of Torch. In particular, he points to a contract between Torch and Halliburton which he argues requires the application of Louisiana law.

Choice of Law
At the outset we observe that the preliminary determination of whether Texas or Louisiana law applies to the question of borrowed servant status is one made difficult by the state of the record presented on appeal. Prior to trial, Torch filed a Motion to Apply Texas Law. On the same day, Torch filed requested jury charges some of which were based on Texas law, including the instruction for borrowed servant. We are without benefit of a transcript from any hearing that was held or any discussion on the matter as it was not designated as a part of the record. In his brief to this court, the plaintiff states that he "may not have preserved that objection by insuring it was made of record, but [he] objected nonetheless. Plaintiff did work with Torch in arriving at an `instruction' on borrowed servant in order to expedite matters." While there may have been no formal ruling prior to trial, the trial court accepted an amended version of Torch's instruction on the borrowed servant doctrine, an instruction based on Texas law. The trial court clearly understood this as the trial transcript indicates that Texas jurisprudence was discussed in shaping the instruction.[2] In any event, whether ideally preserved or not, the substance of the law regarding borrowed servant status appears to be substantially similar. However, this court *87 must determine the proper law for our review of whether the jury's finding was factually sound.
The Louisiana Civil Code provides general guidance for conflict of laws issues stemming from delictual and quasi-delictual obligations at Article 3542, et seq. Article 3542 is entitled "General rule" and provides as follows:
Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.
Guidelines for specific issues are contained in articles subsequent to Article 3542.[3] La.Civ.Code art. 3544 provides:
Issues pertaining to loss distribution and financial protection are governed, as between a person injured by an offense or quasi-offense and the person who caused the injury, by the law designated in the following order:
(1) If, at the time of the injury, the injured person and the person who caused the injury were domiciled in the same state, by the law of that state. Persons domiciled in states whose law on the particular issue is substantially identical shall be treated as if domiciled in the same state.
(2) If, at the time of the injury, the injured person and the person who caused the injury were domiciled in different states: (a) when both the injury and the conduct that caused it occurred in one of those states, by the law of that state; and (b) when the injury and the conduct that caused it occurred in different states, by the law of the state in which the injury occurred, provided that (i) the injured person was domiciled in that state, (ii) the person who caused the injury should have foreseen its occurrence in that state, and (iii) the law of that state provided for a higher standard of financial protection for the injured person than did the law of the state in which the injurious conduct occurred.
The above provision appears to be that applicable to the issue of whether Torch is immune to liability in tort due to the plaintiff's status as a borrowed servant. Comment (a) to La.Civ.Code art. 3543, which applies to issues of conduct and safety, provides:
This Article applies to "issues pertaining to standards of conduct and safety" as distinguished from "issues of loss distribution and financial protection" which are governed by Article 3544, infra. This distinction draws from the substantive law of torts and its two fundamental objectivesdeterrence and compensation. By way of illustration, so-called "rules of the road" establish or pertain to "standards of conduct and safety", whereas rules that impose a ceiling on the amount of compensatory damages or provide immunity from suit are *88 "rules of loss-distribution and financial protection."

(Emphasis added.) See also Rigdon v. Pittsburgh Tank & Tower Co., 95-2611 (La.App. 1 Cir. 11/8/96); 682 So.2d 1303.
As briefly mentioned above, the plaintiff contends that application of the facts presented to La.Civ.Code art. 3544 requires the application of Louisiana law as it refers to the domiciles of the injured person and the "person who caused the injury," not the injured party and the party who caused the injury. He claims that, although Torch is domiciled in Texas, it is not alleged to be the "person who caused the injury." Instead, the plaintiff asserts that McCartney, whose domicile is in Louisiana, is the "person who caused the injury." As he and McCartney are both domiciled in Louisiana, the plaintiff contends that La.Civ.Code art. 3544(1) requires the application of Louisiana law. He further argues that the contract between Halliburton and Torch mandates the application of Louisiana law.
We disagree and conclude that the trial court correctly instructed the jury as to Texas law in this area. While the plaintiff has alleged that McCartney was the person who told the Lafayette Well Testing employee to open the well and therefore was, in fact, the person who caused the injury, we do not conclude that the statute overlooks the domicile of the employer in this way. The employer is of course vicariously liable for its employee's negligence. Here, Torch, as McCartney's employer and the named party, is standing in the place of McCartney. While McCartney is unquestionably an actor, he is nonetheless one unnamed as a party. Here, the employer, through its employee is alleged to be "the person who caused the injury."[4] As the person injured is domiciled in Louisiana and the "person" who caused the injury is domiciled in Texas, Article 3544(2)(a) provides that Texas law will control, as both the injury and the conduct that caused it, or alleged to have caused it, occurred in that state.[5]
We also consider the plaintiffs contention that the contract between Halliburton and Torch required the application of Louisiana law. The contract, which was entered into the record as a plaintiffs exhibit without objection by Torch, is signed by the Halliburton Vice-President for USA Operations, dated April 24, 1991, and indicates that it was executed subject to an attached amendment. It is the *89 amendment, dated April 30, 1991, and once again signed by the Halliburton representatives that contains the choice of law provision and reads:
"21. This agreement shall be governed by and construed in accordance with the General Maritime Law of the United States for marine work and in accordance with the law of the state of Louisiana for land work."
We conclude that this agreement is not controlling as to choice of law in this instance. First, although it was entered into evidence without objection from Torch, the contract does not bear the signature of Torch representatives. Rather, it is signed only by representatives of Halliburton and its subsidiaries. Neither is there any testimony placing the contract into context or explaining the lack of signatures by Torch officials.
Notwithstanding the lack of indication that the amendment to the contract was in effect, the choice of law amendment provides only that the "Agreement" is to be governed/construed in accordance with Louisiana law for land work. The problem facing the court in this instance does not arise from the "Agreement" between the two parties. While a portion of the contract anticipating that Halliburton will be considered an independent contractor may very well be persuasive and will be discussed below, it is not, alone, determinative of whether an employee was a borrowed servant. Accordingly, we do not find that the amended language to the contract requires application of Louisiana law. Thus, we begin our analysis of the jury's conclusion that the plaintiff was a borrowed servant of Torch using Texas law.

Factual Sufficiency
As briefly mentioned above, the plaintiff contends that the jury was manifestly erroneous in concluding that he was acting as a borrowed servant at the time of the accident. He points to a provision in the Halliburton/Torch contract indicating that Halliburton will be treated as an independent contractor while working for Torch and contends that Texas law provides that the contract is controlling absent indication it is a sham or that control was exercised in a manner inconsistent with the contract. Further, he points to testimony from those at the scene and argues it indicates Torch did not exercise control over the Halliburton employees.
As in Louisiana, recovery of workers' compensation benefits is the exclusive remedy available to an employee who sustains a work-related injury under Texas law. See Tex. Lab.Code Ann. § 408.001(a) (West 1996). Under certain circumstances, an employee of a general employer may be considered to simultaneously be a borrowed servant of another, a borrowing employer. Dodd v. Twin City Fire Ins. Co., 545 S.W.2d 766 (Tex.1977). See also Sparger v. Worley Hosp., Inc., 547 S.W.2d 582 (Tex.1977). The concept of the borrowed servant resolves the issue of common law liability for the employer who actually exercises the right of control over the manner and details of the employee's work. Marshall v. Toys-R-Us Nytex, Inc., 825 S.W.2d 193 (Tx.Ct.App.1992), writ denied. Which employer retains the "right of control" is the critical inquiry in determining whether an employee has become a borrowed servant. See Producers Chem. Co. v. McKay, 366 S.W.2d 220 (Tex. 1963).
In Producers Chemical, 366 S.W.2d 220, the Texas Supreme Court observed that, while the presence or absence of a contract establishing the relationship between the employers may ease the analysis, the problem becomes more difficult in the absence of such clear guidelines. The court explained:
When a contract, written or oral, between two employers expressly provides that one or the other shall have right of control, solution of the question is relatively simple. It is when the contract between the employers is only implied or contains no provision for the right of *90 control that the problem becomes difficult. In such cases right of control is necessarily determined as an inference from such facts and circumstances as the nature of the general project, the nature of the work to be performed by the machinery and employees furnished, length of the special employment, the type of machinery furnished, acts representing an exercise of actual control, the right to substitute another operator of the machine, etc.
Id. at 226 (citations omitted). The Texas Supreme Court has more recently considered its ruling in Producers Chemical and concluded that even the existence of a contract between the employers is not necessarily determinative. See Exxon Corp. v. Perez, 842 S.W.2d 629 (Tex.1992). In Perez, the court explained:
In Producer's Chemical we recognized that whether a general employee of one employer may, in a particular situation, become the borrowed servant of another employee is often a difficult situation. A contract between two employers providing that one shall have the right of control over certain employees is a factor to be considered, but it is not controlling. This court has held that a contract will not prevent the existence of a master-servant relationship where the contract is "a mere shame or cloak designed to conceal the true legal relationship between the parties." Where the right of control prescribed or retained over an employee is a controverted issue, it is a proper function for the factfinder to consider what the contract contemplated or whether it was even enforced.
Id. at 630 (citations omitted).
At the close of evidence in this case, the trial court denied the plaintiffs motion for directed verdict on the issue of borrowed servant status, finding that the question should be given to the jury. The jury concluded that the plaintiff was acting as Torch's borrowed servant at the time of the accident. After reviewing the evidence and considering the jurisprudential factors set forth above, we find this determination erroneous as it is unsupported by the record. As explained in both Producers Chemical and Perez, the task of ascertaining right of control would be simplified by a contract between the employers establishing the right of control. While a contract was entered into evidence in this case, the weight to be afforded that document is questionable due to the lack of indication that Torch acquiesced in the agreement, as explained above. The contract is entitled Independent And/Or Vendor Contractor Agreement and contains the following language:
The following is an Agreement between HALLIBURTON SERVICES, A DIVISION OF HALLIBURTON COMPANY, hereinafter referred to as "Contractor," and Torch Operating Company, hereinafter referred to as "Customer," entered into this 30th day April, 1991.
. . . .
12. Contractor shall be an independent contractor with respect to the performance of all work hereunder and neither Contractor nor anyone employed by Contractor shall be deemed for any purpose to be an employee, agent, servant or representative of Customer in the performance of any work or service or part thereof in any manner dealt with hereunder. Customer shall have no direction or control of Contractor, its employees and agents except in the results to be obtained. The work contemplated herein shall meet the approval of Customer to be subject to the general right of inspection for Customer to secure the satisfactory completion thereof. The actual performance and superintendence of all work hereunder shall be by Contractor, but Customer or its representative shall have unlimited access to the operations to determine whether the work is being performed by Contractor in accordance with all of the provisions of this agreement.
*91 Even if we were to conclude that evidence of the validity of the document was sufficient, our inquiry would not end here due to the discussion in Perez regarding the possibility that such a contract is not conclusive if a sham or if it cloaks the true intent of the parties. Even without consideration of the contract, the evidence presented is insufficient to establish that the right to control Foshee's actions was relinquished by Halliburton in favor of Torch.
Foshee testified he and Buller arrived at the site in their Halliburton pump truck and stopped by McCartney's office. They were told to rig up. Foshee testified that, once rigged up, a meeting was held at the manifold where McCartney told him the lines should be tested prior to killing the well and the level at which the testing should take place.[6] Other than this type of testimony, which is essentially uncontradicted, there is no evidence of any other type of control by Torch. Rather, McCartney testified that as Torch's company man, he was in charge of the entire well site and had the authority to ask any Halliburton personnel he was displeased with to leave the site. He also stated that he told Halliburton where to hook up and informed them of the pressures involved. However, he stated that he acted as a coordinator between the various crews who were on site, in this case, Halliburton and Lafayette Well Testing. He described these crews as specialists in their own fields and even stated that Torch owned none of the equipment used at the scene. He testified that "[a]s with any oil company, but most oil companies, the operators don't have their own equipment; they contract their services." The scenario described by the parties is in line with McCartney's description of coordinating the specialists involved. This type of coordination, which includes the right to ask Halliburton employees to leave Torch property, directions to the appropriate place to hook up, and the limited control of informing the crew of the pressures involved, is insufficient to transfer the right of control of an employee from a general employer to a borrowing employer.
Furthermore, a finding of borrowed servant status directly contradicts Foshee's own testimony regarding supervision at the site. On direct examination by his counsel, Foshee testified as follows:
Q And if you would, tell us a little about work that was required of you as a service supervisor.
A As a service supervisor, I had responsibilities for doing the job calculations, dealing with the customer, overseeing and helping rig up whatever lines or equipment that we needed, and then running the job itself.
Q When dealing with a customer let's take the incident where you were out on the job in Jasper and working on this job for Torch. Who would the customer be?
A For Torch? Torch would be the customer.
Q Torch is the customer.
A Right.
Q Okay. And who is it that you would have to deal with?
A With their representative, whoever's representing Torch. And in this instance, it was Mr. McCartney over here.
Q When you're out on a job, such as what you were on, who has direct control or supervision of you?
A Halliburton does.
Q And anybody who's working underneath you, subject to your supervision, would be,-who would they be under the direct control?
A They would be under my control and Halliburton's control.
Q If there was a disagreement between the company man and you as to how you were going to rig up in a certain job, and he said, "I want you to rig up this way," and you said, "No, I'm not *92 going to do it that way. Halliburton procedure is the way I want to do it." What would happen there?
A We would try to talk it out. I would try to explain my point of why we needed to go to do it that way. And if we couldn't reach no agreement, you know, I would put in a call to one of my supervisors or whoever's over me and let them know what the problem is and they would take it from there, you know. We would work out something.
Q Your final instructions would come from someone within Halliburton?
A Right.
Buller, a service supervisor with Foshee at the time of the accident, testified that he did not receive any direct orders from McCartney. He stated that he answered to Foshee on that day since he was the junior employee. However, Buller also testified that on the jobs where he has acted as the senior service supervisor, he has never let anyone direct his work. He confirmed that he always reports and is responsible to Halliburton. Buller also stated that if confronted with a situation where a company man wants a crew change, he would always check with Halliburton first.
Given this evidence indicating that Foshee was ultimately responsible to Halliburton, Torch did not supply any tools used at the site, the Halliburton crew was only called to the site for the two-day project to kill the well, and any control by Torch was in the way of coordination, we conclude that the record does not support a finding of borrowed servant status.

Fault Apportionment
Due to the finding that Foshee was not Torch's borrowed servant, workers' compensation benefits are not the plaintiff's exclusive remedy. Accordingly, we consider the plaintiff's assertion that the jury's finding of fault on his part was manifestly erroneous. Arguing that the evidence does not support a finding of fault by both parties, he points out that McCartney admitted that he signaled Scarborough to open the well. Foshee contends in his brief that Torch argued that the plaintiff was negligent in: 1) telling McCartney he was ready to open the well too early; 2) not using a check valve; 3) failing to ensure that McCartney knew there was a leak; and 4) not immediately closing the bleeder valve after the explosion. Foshee argues that the record supports none of these and, therefore, any apportionment of fault in this regard was error. We disagree.
Notwithstanding the plaintiff's arguments regarding Torch's theories of his negligence, the jury's apportionment is supported by the record. As seen above in our discussion of the factual background, McCartney testified that he told Scarborough to open the well after Foshee told him: "`I've got a test.'" McCartney stated that he asked Foshee whether he was ready to open the well, and when Foshee responded in the affirmative, Scarborough was given the signal. This version of events, alone, supports a finding that the plaintiff gave an unclear or incorrect instruction to McCartney. Further, the testimony also supports a finding that McCartney may have been at fault for the remaining twenty-five percent of fault for not ensuring a clear communication system or ensuring that the leak was repaired and the bleeder valve closed before opening the well. While other avenues for a finding of fault on the part of the actors may have also existed, acceptance of McCartney's testimony alone supports the jury's verdict. As the record supports the jury's finding and is not manifestly erroneous, we do not alter its apportionment of fault.

Damages
The plaintiff next argues that the jury erred in awarding damages for past and future wage loss, but not awarding past medical expenses, the quantum of which was stipulated to, or general damages. Because the plaintiff was dismissed due to the finding that he was acting as a borrowed servant, the judgment rendered *93 in this matter made no award to the plaintiff. However, after the verdict, the trial court was asked to consider whether Louisiana or Texas law applied in matters of fault allocation. Although no damages were being awarded, the trial court rendered written reasons finding that Louisiana law as to allocation of fault should be applied. The written reasons briefly indicate:
This matter was tried before a jury on January 26, 1999 through January 29, 1999. The jury found, in pertinent part, that the plaintiff, John Foshee, was a borrowed employee of Torch Operating and assessed fault at 75% for plaintiff and 25% for Torch. Subsequently, Mr. Ian McDonald, attorney for Torch, requested a conference with this court because the parties could not agree on the form of the judgment.
On March 2, 1999, a telephone conference was held with all counsel of record participating. After considering the arguments, the court held that Louisiana comparative negligence law applies in this case. Louisiana Civil Code Art. 3544 states that issues of loss distribution are governed by the domicile of the plaintiff and the party causing the injury if both are domiciled in the same state. In this case since John Foshee and the person causing the injury, Wayne "Snuffy" McCarthy[sic], are both domiciled in Louisiana, Louisiana law applies. Furthermore, Torch, in its contract with plaintiff's employer Halliburton, had agreed that Louisiana law would be applicable.
La.Civ.Code art. 3544, the very article applied in our choice of law discussion regarding borrowed servant status, is not only applicable to financial protection issues, but to issues of loss distribution as well. In our discussion of borrowed servant status, we concluded that the trial court correctly instructed the jury as to Texas law as McCartney is not the "person who caused the injury" for purposes of the statute. Rather, Torch, the vicariously liable employer, and the named party is that "person." As the person injured, Foshee, and Torch are from different states, the law of the state of the injury and the tortious conduct applies. La.Civ.Code art. 3544(2)(a). As it does for the issue of financial protection, Texas law applies to issues of loss distribution. A conflict in interpretations on this Article is legal error, either in decisions of the lower court or of this court. Accordingly, although Torch has not appealed the trial court's determination that Louisiana law applies to loss distribution, the trial court's determination that Louisiana law applies to the issue of loss distribution was an error of law. We therefore consider the applicable law, that of Texas.[7]
While La.Civ.Code art. 2323 permits recovery for a plaintiff at fault in excess of fifty-percent, Texas law prohibits recovery in such a circumstance. Tex. Civ. Prac. & Rem.Code § 33.001 provides: *94 "In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent." Our review of the jury's apportionment of seventy-five percent of the fault to the plaintiff revealed no error; thus, under Texas law, the plaintiff is barred from recovery. Although our decision is based on different reasoning, our conclusion remains the same as that reached by the trial court. The plaintiff's claims must be dismissed, not because of the borrowed servant doctrine, but due to the choice of law provisions requiring the application of Texas' contributory negligence law. Accordingly, we affirm the trial court's dismissal.

DECREE
For the reasons assigned, the judgment of the trial court in favor of the defendants, Torch Operating Company and Lafayette Well Testing, Inc., dismissing the plaintiff's demands, is affirmed. All costs of this proceeding are assessed against the plaintiff, John Foshee.
AFFIRMED.
DOUCET, C.J., concurs in the result, finding the trial court's findings to be correct.
NOTES
[1] Dorothy Foshee, Mr. Foshee's former wife, initially filed suit for loss of consortium. However, her claim was voluntarily dismissed.
[2] The jury was instructed, in part, as follows:

You will also be asked to determine whether or not the plaintiff was a borrowed servant of one of the defendants, Torch Operating Co.. I will instruct you on the law in regard to borrowed servants and independent contractors. A general employee of one employer may, in a particular situation, become the borrowed servant of another employer. The determination of whether a general employee has become a borrowed employee rests in the right of control of the manner in which the employees perform the services. One would otherwise be in the general employment of one employer is a borrowed employee of another employer if such other employer or his agents have the right to direct and control the details of the particular work and not merely the result to be accomplished. A contract between two employers providing that one shall have the right of control over certain employees is a factor to be considered but is not controlling where the contract is a mere sham or cloak designed to conceal the true legal relationship between the parties.
When an independent contractor is performing work on the premises, however, the general rule is that an owner or occupier does not have a duty to see that an independent contractor performs work in a safe manner. An independent contractor is responsible for conducting its work in a safe manner when the work is conducted by and is under the control of the independent contractor, when the danger arises out of the independent contractor's employee's performance of the work.
There is an exception to the general rule. When the owner of general contractor retains or exercises some control over the independent contractor's work, it may assume a duty to exercise reasonable care in supervising the subcontractor's activities. This exception applies when the employee retains some control over the manner in which the independent contractor's work is performed.
If a contractor assumes this duty of supervising an independent contractor, then it has a duty to exercise reasonable care to see that the activities which it supervises are carried out safely.
[3] La.Civ.Code art. 3543 relates to issues of conduct and safety. The application of Texas law on these issues appears to be uncontested. Article 3543 provides:

Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.
[4] A corporation is included within the codal concept of "person." La.Civ.Code art. 24 provides:

There are two kinds of persons: natural persons and juridical persons.
A natural person is a human being. A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership. The personality of a juridical person is distinct from that of its members.
Furthermore, in a conflict of law case, the Louisiana Civil Code directs:
Unless otherwise expressly provided by the law of this state, cases having contacts with other states are governed by the law selected in accordance with the provisions of Book IV of this Code.
Book IV, Article 3518 addresses "domicile" in the context of conflict of laws issues and provides:
For the purposes of this Book, the domicile of a person is determined in accordance with the law of this state. A juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is most pertinent to the particular issue.
[5] We are also mindful that La.Civ.Code art. 3544(1) provides that even if the injured person and the person causing the injury are domiciled in different states, they are treated as sharing a domicile if the law of the two states is "substantially identical[.]" The preliminary considerations required under the borrowed servant doctrine are very similar in both states, if not substantially identical. However, additional elements must be demonstrated under Texas before defendants can avail themselves of the bar to liability in tort. See, e.g, Tex. Lab.Code Ann. § 406.005. As such, the larger issue of exclusive recovery under workers' compensation law due to the applicability of the borrowed servant doctrine differs. Thus, we review the entirety of the borrowed servant/workers' compensation matter referencing Texas law.
[6] Foshee testified that Halliburton also has a policy of pressure testing before every job.
[7] Louisiana law does not preclude recovery due to fault of the plaintiff. La.Civ.Code art. 2323 provides:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.