**Dr. C. F. SPARGER, Petitioner,**

v.

**WORLEY HOSPITAL, INC., et al., Respondents.**

No. B–5721.

Supreme Court of Texas.

Jan. 12, 1977.

On Rehearing March 2, 1977.

Stokes, Carnahan & Fields, Richard E. Stokes, Jr., Amarillo, for petitioner.

Anderson, Henley, Shields, Bradford, Pritchard & Miller, L. W. Anderson, Dallas, Buzzard & Comer, Ross N. Buzzard, J. B. McGuire, Jr., Pampa, for respondents.

POPE, Justice.

This is a medical malpractice case. The plaintiff Sylvia Caldwell sued Worley Hospital, Inc. and Dr. C. F. Sparger for injuries resulting from the failure to remove a sponge from Mrs. Caldwell's abdominal cavity after an operation. The trial court rendered judgment on a jury verdict for plain-

tiff against Worley Hospital only. The court of civil appeals reversed that judgment and held that Dr. Sparger under the captain of the ship doctrine was liable as a matter of law and that the defendants were jointly and severally liable. 529 S.W.2d 639. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

The jury by its verdict found that someone in the group comprising Dr. Sparger, Dr. Bellamy, and the surgical nurses was negligent with respect to the sponge that was found in Mrs. Caldwell's abdomen. The jury found that this negligence was the proximate cause of Mrs. Caldwell's injury. The jury refused to find that Dr. Sparger failed to exercise ordinary care by looking for the sponge in question before closing the incision in plaintiff's abdomen. The jury did find that Wanda Ensey, Marjie Holland, Geneva Finney, (nurses) or any of them, failed to make a correct sponge count and this negligence was the proximate cause of Mrs. Caldwell's injury. The jury refused to find that in watching after the sponges the three nurses were the borrowed servants of Dr. Sparger.

The plaintiff did not sue the nurses, and Dr. Bellamy has gone out of the case by reason of an instructed verdict in his favor. The jury answers exonerated Dr. Sparger from every act of negligence for which he was charged and found instead that the nurses were negligent. Dr. Sparger is therefore before us with an application for writ of error in which he insists that the court of civil appeals should not have held him vicariously liable as a matter of law for the negligence of the nurses under the so-called captain of the ship doctrine. Worley Hospital's application contends that Dr. Sparger must bear the sole liability since the captain of the ship doctrine made the nurses his exclusive employees. The issue presented is whether Dr. Sparger is liable as captain of the ship notwithstanding the finding that the nurses were not his borrowed servants.

If this was anything but a malpractice case, the question before us would be re-solved by the jury's refusal to find that Dr. Sparger had borrowed the Worley Hospital's nurses so as to make them his employees. Mrs. Caldwell sought to hold Dr. Sparger vicariously liable 'for the improper sponge count by submitting the following special issue concerning the employment relationship between the surgeon and the assisting nurses:

SPECIAL ISSUE NUMBER FOUR:

Do you find from a preponderance of the evidence that in watching after the lap packs Wanda Ensey, Marjie Holland and Geneva Finney were borrowed employees of Dr. Sparger?

A "Borrowed Employee", as used in this charge, means one, who, while in the general employment of the hospital, is subject to the right of the physician to direct or control the details of the particular work inquired about, and is not merely cooperating with suggestions of said physician.

An employee in the general employment of one employer may be temporarily loaned to another so as to become a borrowed employed [sic] of the second employer. Under these circumstances, a person may serve two masters simultaneously and at times only momentarily.

Answer "Yes" or "No"

ANSWER: __No__

Texas has long recognized that a general employee of one employer may become the borrowed servant of another. *J. A. Robinson Sons, Inc. v. Wigart*, 431 S.W.2d 327 (Tex.1968); *Producers Chemical Company v. McKay*, 366 S.W.2d 220 (Tex. 1963). Restatement (Second) of Agency § 227 (1958). Under the borrowed servant doctrine the essential inquiry would be whether or not the surgeon had the *right to control* the assisting nurses in the details "of the specific act raising the issue of liability." *J. A. Robinson Sons, Inc. v. Wigart, supra* at 330. The right of control is ordinarily a question of fact. *See J. A. Robinson Sons, Inc. v. Wigart, supra; Newspapers, Inc. v. Love*, 380 S.W.2d 582 (Tex.1964).

The principle of borrowed servant cuts across the entire law of principal and agent and employer and employee, and is therefore also applicable to the legal relationships between a physician or surgeon and a nurse. Physicians and surgeons are and should be subject to the usual rules applicable to borrowed servants. In some jurisdictions, however, there has been imposed upon the medical profession, a special and more onerous form of vicarious liability. Our question is whether they should have an extra liability imposed upon them.

The phrase "captain of the ship", was first employed in the medical malpractice context in the case of *McConnell v. Williams*, 361 Pa. 355, 65 A.2d 243 (1959). It was used in that case as an apt analogy but in some jurisdictions the phrase has grown into a separate and independent concept of agency which specially applies to medical malpractice cases. *Rockwell v. Stone*, 404 Pa. 561, 173 A.2d 48 (1961); *Yorston v. Pennell*, 397 Pa. 28, 153 A.2d 255 (1959); *Mazer v. Lipschutz*, 327 F.2d 42 (3d Cir. 1963); Young, *Separation of Responsibility in the Operating Room: The Borrowed Servant, the Captain of the Ship and the Scope of Surgeons' Vicarious Liability*, 49 Notre Dame Lawyer 933 (1974).

In naval parlance, the captain of a ship is in total command and is charged with full responsibility for the care and efficiency of the ship and the welfare of all hands. His authority over his own ship and crew is supreme. The captain does not, however, assume personal responsibility for the acts of misconduct or for the criminal deeds committed by the individual men aboard his ship. The court in *McConnell* did not in fact, impose liability upon the surgeon under its handy phrase which characterized him as the captain of the ship. The court instead ruled that "[i]t is for the jury to determine whether the relationship between defendant and the interns, at the time the child's eyes were injured, was that of master and servant. . . ." The court remanded the cause for the factual determination. Other medical malpractice cases have treated the disputed borrowed servant issue in the same manner, as one of fact.

Similes sometimes help to explain a factual situation, but in legal writing, phrases have a way of being canonized and of growing until they can stand and walk independently of the usual general rules. Mr. Justice Frankfurter once wrote concerning such phrase-making in judicial opinions: "The phrase . . . is an excellent illustration of the extent to which uncritical use of words bedevils the law. A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas." *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 68, 63 S.Ct. 444, 452, 87 L.Ed. 610 (1942). The result in the use of captain of the ship is that a surgeon or physician may be held liable, not as others upon the basis of the general rule of borrowed servant, but as captain of the ship.

The jurisdiction which first employed the metaphor has now retreated from the concept so that occurrences in the operating room might be brought back to the confines of the more general borrowed servant concept. The court in *Thomas v. Hutchinson*, 442 Pa. 118, 275 A.2d 23 (1971), said that the captain of the ship example was intended as an adaptation of the familiar borrowed servant principle that applies generally in the law of agency. *See* Note, *Malpractice-Vicarious Liability of an Operating Surgeon*, 10 Duquesne L.Rev. 117 (1971). Hence, where there are inconsistent factual inferences concerning the servant's employer which can be reasonably drawn from evidence, the issue should be resolved factually as any other borrowed servant issue. *Buzan v. Mercy Hospital*, 203 So.2d 11 (D.Ct.App.Fla.1967); *Danks v. Maher*, 177 So.2d 412 (La.Ct.App.1965); *Campbell v. Thornton*, 333 N.E.2d 442 (Mass.1975); *Synnott v. Midway Hospital*, 287 Minn. 270, 178 N.W.2d 211 (1970); *Nichter v. Edmiston*, 81 Nev. 606, 407 P.2d 721 (1965); *Tonsic v. Wagner*, 458 Pa. 246, 329 A.2d 497 (1974); Annot., 12 A.L.R.3d 1017, 1021 (1967).

This court has not previously addressed the question of the adoption of the captain of the ship doctrine as a basis for a surgeon's liability in addition to his responsibility under the borrowed servant doctrine. In *Webb v. Jorns*, 488 S.W.2d 407 (Tex. 1973), the application of the captain of the ship doctrine was not an issue since the physicians conceded that they were subject to liability for actions of any of the persons under their supervision in the operating room. 488 S.W.2d at 411. In *McKinney v. Tromly*, 386 S.W.2d 564 (Tex.Civ.App.1965, writ ref'd n. r. e.), the court approved the doctrine. The judgment in that case, however, was not grounded upon the mere presence of the surgeon in the operating room but, as the opinion stated, upon the admitted fact that the doctor had absolute right of control of all personnel in the operating room during the operation. Later, *Harle v. Krchnak*, 422 S.W.2d 810 (Tex.Civ.App.1968, writ ref'd n. r. e.), followed *McKinney* without discussion.

We now disapprove *McKinney* and *Harle* insofar as they suggest that a surgeon's mere presence in the operating room makes him liable as a matter of law for the negligence of other persons. We disapprove the captain of the ship doctrine and hold that it is a false special rule of agency. Operating surgeons and hospitals are subject to the principles of agency law which apply to others. *Tonsic v. Wagner, supra; Bilonoha v. Zubritzky*, 233 Pa.Super. 136, 336 A.3d 351 (1975). The state of the facts may in some cases be such as to make one a surgeon's employee or borrowed servant as a matter of law, but that is not the factual situation before us in this case.

The question remains whether the facts show that, as a matter of law, the nurses were the borrowed servants of Dr. Sparger. Three nurses had assignments in the operating room during the operation. They were hired by and were the general employees of the hospital and were assigned by the hospital for the operation. Dr. Sparger did not participate in their selection. Marjie Holland was the "circulating nurse." As such, she served in that part of the operating room that was designated as the nonsterile field. Wanda Ensey was the "scrub nurse" who was required to remain in the sterile field so that she could assist the surgeon throughout the operation. Geneva Finney was positioned at the foot of the operating table, but she had no responsibilities concerning the sponges.

The duties of the circulating and scrub nurses were detailed in the hospital's Policy & Procedure Manual. There were general instructions which applied to both nurses.[1] There were specific duties assigned to the circulating nurse[2] and specific duties as-

1. "OPERATING ROOM NURSING DUTIES

"Each nurse is responsible for the room to which she is assigned in every detail. This includes maintenance of asepsis, prompt, and exact preparation for all her cases, accuracy in recording, and readiness of all special supplies needed and requested for each case.

"The nurse is responsible for all counts. This includes sponges, needles (both from the rack and traumatic sutures), penrose drains, peanut sponges, umbilical tapes, screws, and any other similar articles which may be brought into the operative field. All counts are taken before the case begins, and are recorded in writing on the operative record. All these must be accounted for before the closure of the operative incision. NO OTHER NEED IS MORE IMPORTANT! If the counts are correct, this is so written on the operative record and signed by the circulating nurse taking the counts. If there is a discrepancy in the counts, the surgeon is immediately notified and a search is made for the missing article. If the missing item is not found after a thorough search, an x-ray is taken of the patient. In this event, an x-ray is mandatory and cannot be refused by the surgeon. There is no charge to the patient for this x-ray; it is paid for by the hospital. . . . counts are taken on each case; one before the case begins; one prior to the closure of the peritoneum·or the first layer of tissue . . . .."

2. "DUTIES OF THE CIRCULATING NURSE

"1.–3. * * *

"4. Check sponge count, needle count, instrument count with scrub before the case is started.

"6.–10. * * *

"11. Place dirty sponges where they can easily be seen by the scrub nurse and the anesthetist. Keep sponges counted and be ready to ·be closed and in a C-Section when the uterus is ready to be closed also."

signed to the scrub nurse.[3] The procedures for the sponge counts were intended for use regardless of the surgeon who was performing an operation in the Worley Hospital.

The mistake in leaving the sponge in plaintiff's abdomen was explained in this way. The circulating nurse had prepared the operating room by laying out the necessary supplies and equipment. She remained in the non-sterile area of the operating room during the operation. The scrub nurse stood within the sterile field and assisted the surgeon by handing him instruments, clamps, and sponges. Before surgery began, the scrub nurse in front of the circulating nurse counted the sponges which had been laid out. The circulating nurse recorded that count. When Dr. Sparger was ready to close the inner layer of tissue, the scrub nurse counted the unused sponges, and the circulating nurse counted the used ones. The total was reported by the scrub nurse as tallying with the record.

Wanda Ensey, the scrub nurse, testified that Dr. Sparger did not direct her and Mrs. Holland to make the sponge count. Mrs. Ensey stated that the two nurses knew how to perform the sponge count, because it was part of the manual regulations which they followed. Reasonable minds might differ as to the facts which presented the borrowed servant issue.

We conclude, therefore, as did the trial court, that plaintiff should have judgment against Worley Hospital since the jury made a finding that it was hospital's employees who were negligent. Since the captain of the ship idea is a false issue and the jury found as a fact that the nurses were not the borrowed servants of Dr. Sparger,

plaintiff was not entitled to a judgment against Dr. Sparger.

The judgment of the court of civil appeals which rendered judgment against both Dr. Sparger and Worley Hospital is reversed and the judgment of the trial court that plaintiff recover against Worley Hospital is affirmed.

SAM D. JOHNSON, J., dissents.

YARBROUGH, J., not sitting. He was not a member of the Court when the cause was orally argued before this Court.

SAM D. JOHNSON, Justice (dissenting).

This dissent is respectfully submitted.

As early as *Moore v. Ivey*, 264 S.W. 283 (Tex.Civ.App.—Galveston 1924), *rev'd on basis of jury misconduct*, 277 S.W. 106 (Tex. 1925), Texas courts have indicated that a surgeon was negligent as a matter of law if a sponge or other foreign object was left in the patient. *See McKinney v. Tromly*, 386 S.W.2d 564 (Tex.Civ.App.—Tyler 1964, writ ref'd n. r. e.); *Thompson v. Barnard*, 142 S.W.2d 238 (Tex.Civ.App.—Waco 1940), *aff'd*, 138 Tex. 277, 158 S.W.2d 486 (1942).

Language in *McKinney v. Tromly, supra*, reveals that the court's decision was not based only on a finding that the facts established as a matter of law that the surgeon had the right to control the nurse. The court quoted with approval the following language from *Aderhold v. Bishop*, 94 Okl. 203, 221 P. 752 (1923):

" 'We can conceive of no instance in which the application of the doctrine of respondeat superior could exercise a more salutary influence than in cases of damage arising out of surgical operations. The patient is helpless under the influ-

---

**3.** "DUTIES OF THE SCRUB NURSE

"1. Dust the room before starting the case.
"2. Help circulating nurse in opening supplies.
"3. When possible pull own sutures for the case.
"4. At least 15 minutes before surgery is scheduled start to scrub and set up.
"5. Check doctors card and set up tables. Sponge count is to be taken before the incision is made.

"6. Try to anticipate the doctors' needs as your surgery progresses.
"7. Any break in technique is to be brought to the attention of the doctors IMMEDIATELY!!
"8. Sponge count is taken as the doctor is *ready to close the peritoneum.* . . . All vaginal surgery is to have a count before the patient leaves the room. All cases require sponge count."

ence of an anaesthetic, and absolutely at the mercy of the surgeons performing the operation, and *they are charged with the duty to see that no preventable injury results to their patient.* \* \* \* If the operating surgeons were not made liable for the negligent performance of the duties of those working under him, the law in a large measure would fail in affording a means of redress for preventable injuries sustained from surgical operations.'" 386 S.W.2d 564 at 565–66. [Emphasis added.]

This language implies that a surgeon may be liable for the negligence occurring in the operating room. This responsibility appears to be a conceded fact in many if not most instances. *Webb v. Jorns*, 488 S.W.2d 407, 411 (Tex.1972). The special relationship that exists between the surgeon and the patient in the operating room justifies the imposition of such liability.

This special relationship arises from the conscious selection by the patient of a particular surgeon, the reliance by the patient on the skill and judgment of the surgeon, the inability of the patient to control any of the actions occurring during surgery, the expectation that the surgeon selected will control the operation, the patient's expectation that the surgeon will require the operating room personnel to follow proper medical procedures, the expectation that the surgeon will protect the patient from the negligence of the operating room personnel, and the responsibility accepted by the surgeon to require the application of proper medical procedures and to exclude unqualified personnel from the operating room. This special relationship is not the only justification for the imposition of liability on the surgeon for negligence in the operating room. The knowledge of such potential liability will prompt the surgeon to initiate every possible safeguard to prevent negligence in the operating room.

Whether the doctrine is known as "captain of the ship" or by some other label, this writer would hold that a surgeon may be liable for any negligence occurring in the operating theater. Liability may be im-

posed on the theory that the surgeon had the right to control the negligent individual or, if there was no right to control, on the theory that the surgeon was negligent in failing to insist on the right to control.

Rather than retain the historic position of this state, that of the courts of civil appeals in *Harle v. Krchnak*, 422 S.W.2d 810 (Tex. Civ.App.—Houston [1st Dist.] 1967, writ ref'd n. r. e.), and *McKinney v. Tromly, supra*, the majority asserts that the surgeon may be held liable as a matter of law only if the facts necessarily lead to the conclusion that the operating surgeon had the right to control the nurses during the course of the operation.

Even applying the standard adopted by the majority, an examination of the evidence in the instant case leads inevitably to the conclusion that the operating surgeon, Dr. Sparger, as a matter of law had the right to control the actions of the nurses with respect to the sponge counts during the course of the operation. Indeed, in the opinion of this writer, such evidence is overwhelming.

With respect to his relationship with the nurses, Dr. Sparger testified as follows:

"Q And during the course of the operation, or the course of treatment or operation, the Surgeon is in charge of the patient?

"A In charge of all the medical aspects of the patient.

"Q And you issued orders to the Nurses in connection with the care and treatment of the patient, and they are supposed to follow them?

"A In regard to the medical aspects.

"Q Now, in connection with an operation, a Surgeon issues orders to the Nurses during the operation, does he not?

"A Correct.

"Q And they are supposed to follow them?

"A Yes, sir.

"Q And you are supposed to tell the Nurses what to do, and what not to do?

"A   Correct, in regard to the medical aspects.

".   .   .

"Q   You certainly wouldn't want a janitor, or a typist, or somebody, or a clerk up there, helping you in the Operating Room, would you?

"A   No, sir.

"Q   You want a Registered Nurse, don't you?

"A   As far as the circulation, yes.

"Q   And you want somebody that has had experience, and has had training?

"A   That is true, and it is a requirement.

"Q   And do you know the Nurses, or did you know the Nurses before you went to Worley Hospital that were assisting you in this operation?

"A   Yes, sir.

"Q   That is Mrs. Ensey, and Mrs. Holland?

"A   Yes.

"Q   And you don't question their ability in any way, or their capabilities, do you?

"A   No.

".   .   .

"Q   Now, you have also told us that you did not ask either Mrs. Ensey or Mrs. Holland for a sponge count, but that they voluntarily gave you one, is that correct?

"A   That's right, at the time of the procedure.

"Q   All right.   And—but if they didn't voluntarily give you one, you would have certainly asked for one, wouldn't you?

"A   Correct.

".   .   .

"Q   All right.   *Now isn't it true that your judgment controls the surgical process from the beginning to end during an operation?*

"A   *The medical aspects of the operation.*

".   .   .

"Q   If there is any conflict or disagreement in judgment between you and somebody else, including the Nurses, or even Dr. Bellamy, who is assisting you, your judgment would control, would it not?

"A   If there is any conflict, that is true, if there is any conflict—

"Q   Yes.   That's right.   *In other words, you are in charge of the operation, and everybody is supposed to do what you tell them?*

"A   *That's right, medically speaking."* [Emphasis added.]

Dr. Sparger also testified that he requested a sponge count after closing the peritoneum but prior to closing the skin.   With respect to the sponge counts, Mrs. Ensey, the operating room technician, testified as follows:

"Q   Now, do you know whether the hospital Regulations required another count after [the time that Dr. Sparger had begun to close the peritoneum]?

"A   No, I don't think they did.   I am sure they didn't, .   .   ."

Mrs. Ensey also testified regarding the relationship between the nurses and Dr. Sparger:

"Q   Are you instructed to follow the doctors' orders at all times?

"A   Yes.

"Q   Do you follow them?

"A   Yes.   I try my best.

"Q   And you are supposed to follow all the orders he gives you?

"A   Yes.

"Q   And he tells you what to do and what not to do?

"A   Yes."

Mrs. Holland, the operating room supervisor and a registered nurse, testified as follows:

"Q   All right.   Then when we got down—when we got down to this second count that you made at the peritoneum, that you have told us about, one, you counted when they

came out of the bucket, and you counted them on the floor with Mrs. Finney, neither one of those doctors directed you to do that?

"A   No, sir. *It is accepted that you do that.*

"Q   Neither one of those doctors ordered you to do that?

"A   You just know they expect it of you.

"Q   Well, I am asking you, did either one of those doctors order you to do that?

"A   No.

"Q   All right. In fact, those Orders and Regulations that control you in that work come from your Worley Hospital Regulations, don't they?

"A   Well, *the doctors just expect you to have a sponge count for them.* It is just the way they expect it.   .   .   .

"   .   .   .

"Q   *Now, in connection with the Operating Room, is the Surgeon, who is performing the operation, is he supposed to give you orders as to what to do, and know what not to do?*

"A   *Yes, sir.*

"Q   *And you are supposed to follow those orders?*

"A   *Yes, sir.*

"A   *Without question?*

"A   *Yes, sir."* [Emphasis added.]

It is undisputed that the Hospital had established standard procedures to be followed by the nurses in the operating room. However, it is obvious that Dr. Sparger had the right to alter the procedures followed by these nurses in this case, and did in fact alter the procedures by requesting a second sponge count.

From the testimony of both the surgeon and the nurses, it is inconceivable that the nurses would have refused to obey an order issued during the course of the operation by the operating surgeon, Dr. Sparger, on the grounds that it conflicted with procedures set forth by the Hospital.

The facts therefore establish as a matter of law that, as to the nurses, the operating surgeon, Dr. Sparger, not only had the right to control but also exercised such control during the course of the operation. The majority asserts: "The state of the facts may in some cases be such as to make one a surgeon's employee or borrowed servant as a matter of law, but that is not the factual situation before us in this case." With all due respect, such is precisely the situation before us in this case, and the quoted testimony makes that fact crystal clear. Under the majority's own standard, during the course of the operation the nurses were the operating surgeon's borrowed servants as a matter of law and the operating surgeon is therefore liable for their negligence.

ON MOTION FOR REHEARING

POPE, Justice.

■ The motion for rehearing of Worley Hospital, Inc. is granted for the purpose of remanding this cause to the court of civil appeals. The cause is remanded so that court may rule on the question whether the jury's refusal to find that the nurses were borrowed employees of Dr. Sparger was against the great and overwhelming weight of the evidence, a point over which this court has no jurisdiction. *See Stanfield v. O'Boyle,* 462 S.W.2d 270 (Tex.1971).

The judgment of the court of civil appeals is reversed and the cause is remanded to that court for further consideration of the state of the evidence.

YARBROUGH, J., not sitting.