Norvin LEWIS and Delores Lewis, Plaintiffs-Respondents-Petitioners,

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN, Jay Seldera, M.D. and Wisconsin Patients Compensation Fund, Defendants-Appellants,

LAKELAND MEDICAL CENTER, The Dean Health Plan, Inc. and Donna Shalala, Defendants.

Supreme Court

*No. 99–0001. Oral argument January 4, 2001.—Decided June 13, 2001.*

2001 WI 60

(Also reported in 627 N.W.2d 484.)

For the plaintiffs-respondents-petitioners there was a brief by *Timothy J. Aiken, James C. Gallanis* and *Aiken & Scoptur, S.C.*, Milwaukee, and oral argument by *Timothy J. Aiken.*

For the defendants-appellants there was a brief by *Christopher P. Riordan, Marianne Morris Belke* and *Crivello, Carlson, Mentkowski & Steeves, S.C.*, Milwaukee, and oral argument by *Christopher P. Riordan.*

¶ 1.   JON P. WILCOX, J.   The issue in this case is whether a surgeon can be vicariously liable for the negligence of two hospital nurses who failed to count accurately the sponges used in a surgical procedure.

Because the plaintiff has not presented a viable doctrine for imposing vicarious liability on the surgeon under existing Wisconsin law and because we decline to adopt the "captain of the ship" theory for Wisconsin, we conclude that the surgeon cannot be held vicariously liable for the negligence of the two hospital nurses.

¶ 2. The plaintiff in this case, Norvin Lewis (Lewis), asserted that the defendant, Jay Seldera, M.D. (Seldera), was vicariously liable for the failure of two hospital nurses, employed by Lakeland Medical Center (Lakeland) in Elkhorn, Wisconsin, to count accurately the number of sponges used in Lewis' gallbladder surgery. As a result of their inaccurate count, a sponge was left in Lewis' abdomen. Lewis stipulated to the fact that Seldera was not negligent. The Circuit Court for Milwaukee County, Michael D. Goulee, Judge, awarded Lewis $150,000, set off by $50,000 from his settlement with Lakeland. The court of appeals reversed the circuit court's decision. For the following reasons, we now affirm the court of appeals' ruling.

I

¶ 3. The parties have stipulated to the relevant facts. Seldera removed Lewis' gallbladder at Lakeland on November 8, 1993. During the surgery, Seldera packed off the gallbladder with laparotomy[1] pads (sponges). Nurses Patricia Vickery (Vickery) and Ellen Chapman (Chapman) were in charge of counting the sponges. Under Lakeland's procedures, the nurses, not Seldera, were responsible for counting the sponges and

---

[1] Laparotomy is an "[i]ncision in the loin." *Stedman's Medical Dictionary* 840 (25th ed. 1990). Laparotomy pads are sponges used to pack off an area in the loin or abdomen.

overseeing the counting of the sponges. Indeed, Chapman, the "circulating nurse" assigned to the operation, had an independent duty delineated in the administrative code to count the sponges. *See* Wis. Admin. Code § HFS 124.13(7) (Oct., 2000) (the " 'circulating nurse' " is "a registered nurse who is present during an operation. . .who, before the surgical procedure. . .is completed,. . .ensures that the sponge, needle and instrument counts have been done according to hospital policy"). Both Vickery and Chapman were employed by Lakeland, not Seldera. According to the medical records from the surgery, Vickery and Chapman counted the number of sponges used on four occasions and they thought that the correct number of sponges had been collected at the end.

¶ 4.　However, Lewis began to have problems and Seldera operated again on January 30, 1994. During this second surgery, a retained sponge was discovered. After this sponge was removed, Lewis recovered. He then brought suit against Lakeland and Seldera.

¶ 5.　Prior to trial, Lakeland agreed that it was responsible for the actions of its employees, Vickery and Chapman. Because Lakeland was a county-owned hospital at the time of the surgery, its liability for the negligence of Vickery and Chapman was limited to $50,000. *See* Wis. Stat. § 893.80(3) (1993–94).[2] After settling with Lakeland for the maximum amount allowed under § 893.80(3), Lewis pursued this case against Seldera. In consideration for Seldera's stipulation to the above facts, Lewis dropped all claims except for the allegation that Seldera could be held vicariously liable for Vickery and Chapman's negligence. Both par-

---

[2] All subsequent references to the Wisconsin Statutes are to the 1993–94 version unless otherwise indicated.

ties moved for summary judgment on the issue of whether Seldera could be so held liable.

¶ 6. The circuit court issued an oral decision, finding "as a matter of law, that [Seldera] is, in fact, responsible and liable for the actions of the parties that were in the operating room with him and working under his supervision." The circuit court maintained that the "doctor is the captain of the ship. That the doctor is responsible for everything." Seldera appealed.

¶ 7. The court of appeals reversed the circuit court's ruling. *Lewis v. Physicians Ins. of Wisconsin*, 2000 WI App 95, ¶ 14, 235 Wis. 2d 198, 612 N.W.2d 389. Judge Fine, writing for the court, rejected the argument that Seldera could be liable for the negligence of the nurses by distinguishing our decision in *Fehrman v. Smirl*, 25 Wis. 2d 645, 131 N.W.2d 314 (1964) (*Fehrman II*)[3] , which held that two doctors could be held liable for a single injury. Judge Fine further observed that "[n]o appellate court in Wisconsin has used the 'captain of the ship' doctrine to impose liability in a medical malpractice case, and the doctrine has generally lapsed into disuse elsewhere with the passage of time." *Lewis*, 2000 WI App 95, ¶ 13. Therefore, the court of appeals declined to apply that doctrine to the present case. *Id.*

¶ 8. Lewis subsequently appealed and this court accepted his petition for review.

---

[3] The same action reached this court in two separate cases: *Fehrman v. Smirl*, 20 Wis. 2d 1, 121 N.W.2d 255 (1963) (*Fehrman I*) and *Fehrman v. Smirl*, 25 Wis. 2d 645, 131 N.W.2d 314 (1964) (*Fehrman II*). Although the underlying facts of the action were set forth in our *Fehrman I* decision, Lewis relies on our discussion of vicarious liability in *Fehrman II*.

## II

■

¶ 9.    This case is before us on a grant of summary judgment. Because the parties have stipulated to the facts, this appeal only raises a question of law, which we review de novo. *L.L.N. v. Clauder*, 209 Wis. 2d 674, 682, 563 N.W.2d 434 (1997).

¶ 10.    At the outset, we note that Lewis is not contending that Vickery and Chapman were employed by Seldera or that Vickery and Chapman were "borrowed servants."[4] Nor is Lewis contending that Seldera was responsible for counting the sponges. Instead, this case turns on whether Seldera is vicariously liable for the negligence of Vickery and Chapman under our holding in *Fehrman II* or whether we adopt the "captain of the ship" doctrine.

■

¶ 11.    It is a basic principle of law, as well as common sense, that one is typically liable only for his or her own acts, not the acts of others.[5] Nevertheless, the law in certain circumstances will impose "vicarious liability" on a non-negligent party. Vicarious ·liability is

---

[4] We declined to discard the "borrowed servant rule" in favor of the "dual liability approach" in *DePratt v. Sergio*, 102 Wis. 2d 141, 147, 306 N.W.2d 62 (1981).

[5] Oliver Wendell Holmes, Jr., *Agency* 5 Harv. L. Rev. 1, 14 (1891). On this point, Holmes wrote:

> I assume that common-sense is opposed to making one man pay for another man's wrong, unless he actually has brought the wrong to pass according to the ordinary canons of legal responsibility,—unless, that is to say, he has induced the immediate wrongdoer to do acts of which the wrong, or, at least, wrong, was the natural consequence under the circumstances known to the defendant.

*Id.*

"[l]iability that a supervisory party (such as an employer) bears for the actionable conduct of a subordinate or associate (such as an employee) because of the relationship between the two parties." *Black's Law Dictionary* 927 (7th ed. 1999). There is a tension, then, between the basic principle of individual responsibility under the law on the one hand and the imposition of vicarious liability on an innocent party for a tortfeasor's acts on the other hand. Because vicarious liability is a severe exception to the basic principle that one is only responsible for his or her own acts, we proceed with caution when asked to impose vicarious liability on an innocent party, doing so only in accordance with well-settled law.

¶ 12. · One well-settled doctrine for imposing vicarious liability is respondeat superior, which allows a non-negligent employer to be held liable for an employee's actions. *See Shannon v. City of Milwaukee*, 94 Wis. 2d 364, 370, 289 N.W.2d 564 (1980) ("Under the doctrine of *respondeat superior* an employer can be held vicariously liable for the negligent acts of his employees while they are acting within the scope of their employment."). Respondeat superior is perhaps the most familiar context in which vicarious liability is imposed. It arises due to the employer's control or right of control over the employee; because of this control or right of control, the negligence of the employee is imputed to the employer in certain circumstances. *Arsand v. City of Franklin*, 83 Wis. 2d 40, 46, 264 N.W.2d 579 (1978); Wis JI—Civil 4030 (1994). Indeed, in the present case, the hospital admitted that it could be held vicariously liable for the negligence of the two nurses under the doctrine of respondeat superior. Lewis, however, does not argue that Seldera is vicari-

655

ously liable for the negligence of Vickery and Chapman under the doctrine of respondeat superior; instead, he contends that Seldera is vicariously liable under our holding in *Fehrman II* or alternatively, under the "captain of the ship" doctrine. We examine each of his theories for imposing vicarious liability on Seldera in turn.

¶ 13. In *Fehrman v. Smirl*, 20 Wis. 2d 1, 6–7, 121 N.W.2d 255 (1963) (*Fehrman I*), the plaintiff's surgeon, Smirl, asked another surgeon, McDonnell, to assist with treating the defendant after Smirl had removed the defendant's prostate gland. The plaintiff was injured during the course of this treatment and filed an action against Smirl. *Id.* at 1–9. During the jury's deliberations, it raised a question regarding Smirl's responsibility relative to McDonnell's responsibility. *Fehrman II*, 25 Wis. 2d at 654. The circuit court responded that Smirl "would be responsible for any failure upon the part of Dr. McDonnell to exercise such care and skill" and Smirl objected on the ground that this response may have led the jury to impose liability on him for negligence committed by McDonnell. *Id.* at 654–55. Justice Gordon, writing for the majority of this court, but not agreeing with it on this issue, stated the majority's holding as such: "under the circumstances of this case, Dr. Smirl either was in charge of the patient or was acting jointly with Dr. McDonnell." *Id.* at 656. Therefore, this court upheld the circuit court's response to the jury's question. *Id.* Lewis characterizes our holding in *Fehrman II* as imposing vicarious liability on a doctor whenever the doctor continues to actively care for and participate in the treatment of the patient. His reading is too broad.

¶ 14. We begin our analysis of *Fehrman II* by recognizing that this court's holding on the issue of

vicarious liability was grounded in the particular facts presented. *Id.* Importantly, we did not assert a new doctrine for imposing vicarious liability. Instead, we merely approved of a response to a question the jury raised during its deliberation regarding Smirl's responsibility relative to McDonnell's responsibility. *Id.* at 653–54. We decline to stretch *Fehrman II* to hold that this court's refusal to overturn a circuit court's response to a jury question created a new doctrine for imposing vicarious liability.

¶ 15.   Moreover, in *Fehrman II* we allowed the circuit court's response to stand in part because it was unclear whose negligence was the cause of the plaintiff's injury.[6] As noted, Smirl was objecting "to the fact that under the court's instruction he was held responsible for the negligence which *may have been* chargeable to Dr. McDonnell." *Id.* (emphasis added). Therefore, as the court of appeals commented, *Fehrman II* more closely resembles the "alternative liability" case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948). There, two hunters simultaneously and negligently shot in the direction of the plaintiff, but it was unclear which bullet injured the plaintiff. *Id.* at 2. Because this extraordinary fact pattern made it impossible for the

---

[6] As this court observed in its discussion of res ipsa loquitur, "[t]here was direct medical proof of negligence." *Fehrman II*, 25 Wis. 2d at 651. On that count, we held that the defendant was entitled to an instruction on res ipsa loquitur where an expert testified that " 'it is my opinion that this result would not have occurred if [Smirl and McDonnell], or either of them, or both, had been exercising the proper skill and care and diligence that is expected of them in the performance of this operation, suprapubic prostatectomy.' " *Id.* Therefore, the jury could have found that both doctors breached their duty of care, but only one doctor caused the plaintiff's injury.

plaintiff to identify which hunter caused his injury, the court determined that he could hold both defendants liable. *Id.* at 4–5. Thus, the "alternative liability" theory was born.

¶ 16.   Without adopting the "alternative liability" theory, we discussed the holding of *Summers* in *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37 (1984) where the plaintiff sought to impose liability on 17 drug companies because she was unable to determine what specific drug company had made the particular drug that caused her injuries. *Id.* at 175. Although we rejected the imposition of liability upon the 17 drug companies, our discussion of "alternative liability" in *Collins* is instructive. In discussing the rule of *Summers*, we wrote that under alternative liability "when all defendants, although acting independently, have breached a duty of care toward the plaintiff but only one of them caused the injury, each defendant must prove that he or she did not cause the plaintiff's injury or be jointly and severally liable with all other defendants." *Id.* at 183. The direct proof of negligence in *Fehrman II*, presented to the jury with the res ipsa loquitur instruction, indicates that both Smirl and McDonnell may have violated their respective duties of care to the plaintiff, but only one doctor's actions may have caused his injury. 25 Wis. 2d at 650–53. Our decision in *Fehrman II* then, while confined to its facts, is more akin to this theory of alternative liability than creating a "continuing active management" theory for imposing vicarious liability.[7] Consequently, *Fehrman*

[7] Given Justice Gordon's equivocal statement of the court's specific holding on the issue of vicarious liability in *Fehrman II*, we caution against relying on that language in the future. *See Fehrman II*, 25 Wis. 2d at 656.

*II* does not support Lewis' new "continuing active management" theory.

¶ 17. Not only does *Fehrman II* fail to support Lewis' new theory, it is distinguishable from the instant case. In this case, Seldera did not breach a duty to Lewis; instead, he stipulated that Seldera was not negligent. In contrast, both Smirl and McDonnell in *Fehrman II* may have breached their duties to the plaintiff. *Id.* at 656. Although in this case there was clearly a breach of duty owed to Lewis, that duty was breached by Vickery and Chapman, the nurses employed by the hospital. Their duties were defined by hospital policy, not by Seldera. Chapman's duty, as the circulating nurse, was also defined by the administrative code. *See* Wis. Admin. Code § HFS 124.13(7) (Oct., 2000). In further contrast to *Fehrman II* where Smirl selected McDonnell to assist with the surgery, the nurses here were selected by Lakeland, not Seldera. *Fehrman II*, therefore, is distinguishable from the present case and cannot be relied upon to impose vicarious liability on Seldera under any theory.

¶ 18. Lewis, however, seeks support for his "continuing active management" theory for imposing vicarious liability on Seldera in the two cases cited by this court in *Fehrman II*, *Morrill v. Komasinski*, 256 Wis. 417, 41 N.W.2d 620 (1950), and *Heimlich v. Harvey*, 255 Wis. 471, 39 N.W.2d 394 (1949). In *Morrill*, this court confronted the issue of whether three doctors could be held jointly and severally liable for failing to diagnose a broken arm properly. 256 Wis. 2d at 426. The family doctor, Dr. Komasinski, objected to being held jointly liable with a more experienced doctor, Dr. Bump, whom he called to assist with the diagnosis and treatment of the plaintiff's broken arm. *Id.* We held that the "evidence amply supports the findings of the

jury." *Id.* The evidence indicated that three doctors, Dr. Komasinski, Dr. Bump, and a Dr. Wright, who was in charge of taking the X rays, "examined the X rays together and decided upon the treatment to be administered." *Id.* at 419. The three doctors then "concluded that the arm should be placed at right angles to the body with the forearm pointing straight upward. . . ." *Id.* It was this diagnosis and treatment by all three doctors that caused the plaintiff's injury. *Id.* at 425. Therefore, all three doctors were jointly and severally liable. *Id.* at 426.

¶ 19.    The central fact that distinguishes *Morrill* from the instant case is that there the jury found negligence on the part of all three doctors who acted in concert whereas here Lewis has stipulated that Seldera was not negligent. There was no imposition of vicarious liability in *Morrill*. Accordingly, *Morrill* does not support the theory advanced by Lewis of imposing vicarious liability when the non-negligent doctor "continues active participation" in the patient's case.

¶ 20.    Likewise, *Heimlich* provides no assistance to Lewis. There, the defendant, Dr. Harvey, objected to the imposition of liability when the injury suffered by his patient may have been inflicted through the course of treatment by his employee, Dr. Baird, rather than by him. *Heimlich*, 255 Wis. 2d 471. Noting that Dr. Harvey "testified that Dr. Baird worked for him for a salary plus commission," we rejected Dr. Harvey's argument by stating that "it appears to us as well as to the jury that [Dr. Harvey] has completely acknowledged the acts of Dr. Baird to be his own, which is a very good recognition of responsibility under the familiar doctrine of *respondeat superior*." *Id.* at 474–75. Thus, *Heimlich* was resolved under the well-settled law of

respondeat superior and did not involve the creation of a new doctrine for the imposition of vicarious liability.[8]

¶ 21. As a result, Lewis has not presented a viable doctrine for imposing vicarious liability on Seldera under existing Wisconsin law.[9]

## III

¶ 22. Alternatively, Lewis asks this court to follow the circuit court's lead and adopt the "captain of the ship" doctrine in order to impose vicarious liability on Seldera.[10] Similar to respondeat superior, "captain of

---

[8] We observe that the evidence presented could have led the jury to conclude that Dr. Harvey was jointly liable with Dr. Baird because he followed Dr. Baird's injection with another injection at the next visit. *Heimlich v. Harvey*, 255 Wis. 471, 472, 39 N.W.2d 394 (1949). The expert testimony indicated that the injections were the cause of the defendant's injury. *Id.* at 473.

[9] Lewis cites *Bailey v. Sturm*, 59 Wis. 2d 87, 93 n.4, 207 N.W.2d 653 (1973), as approving of his interpretations of *Fehrman II*, *Morrill v. Komansinski*, 256 Wis. 2d 417, 41 N.W.2d 620 (1950), and *Heimlich*. He reads too much into this collecting of cases, which does not create a new theory for imposing vicarious liability on an innocent party. Furthermore, in brief parentheticals, we characterized *Fehrman II* and *Morrill* as joint liability cases and *Heimlich* as a case of respondeat superior. *Bailey* 59 Wis. 2d at 93 n.4. Thus, our cursory description of these three cases in *Bailey* is in accord with our in-depth discussion above.

[10] The concurrence breezily suggests that we avoid the possible danger of running aground through analysis of the "captain of the ship" theory for imposing vicarious liability. Concurrence at ¶¶ 29–31. We agree that other jurisdictions have wrestled with this theory for imposing vicarious liability, which now lacks a solid agency law foundation due to the demise of the charitable immunity doctrine. *See* Majority op. at ¶¶ 22–24. Because of the difficulties presented by "captain of

661

the ship" is another theory that allows a party to invoke vicarious liability, but it has never been recognized in Wisconsin and, as the court of appeals acknowledged, has fallen into disfavor in other jurisdictions.[11] *Lewis*, 2000 WI App 95, ¶ 13. Because

the ship", we also agree that it would be much easier, as the concurrence seems to propose, to ignore this outdated theory and engage in an unencumbered search for another theory to impose vicarious liability on surgeons. Concurrence at ¶ 31. However, as a court, we are confined to issues and arguments presented in the case before us. Accordingly, it is necessary to address "captain of the ship" because the circuit court premised Seldera's liability on it and Lewis argued it before us as an alternative theory for imposing vicarious liability on Seldera. We further agree with the concurrence that there are hypotheticals—with the right facts—where vicarious liability might perhaps be imposed through a theory of agency law such as respondeat superior or borrowed servant. *See* Concurrence at ¶¶ 33–37. However, the present case is not such a hypothetical—with the right facts—where vicarious liability might perhaps be imposed on an individual through a theory of agency law such as respondeat superior or borrowed servant. This court only decides cases with real disputes arising from events that actually took place.

[11] Pennsylvania, which first raised the "captain of the ship" doctrine in *McConnell v. Williams*, 65 A.2d 243 (Pa. 1949), has since rejected it in *Tonsic v. Wagner*, 329 A.2d 497, 499–501 (Pa. 1974), and *Thomas v. Hutchinson*, 275 A.2d 23, 27–28 (Pa. 1971), because of the demise of charitable immunity. Other jurisdictions declining to adopt the doctrine or abrogating it include: Iowa in *Tappe v. Iowa Methodist Med. Ctr.*, 477 N.W.2d 396, 402–403 (Iowa 1991) (noting that "captain of the ship" is not in accord with modern practice and refusing to adopt it); New Jersey in *Sesselman v. Muhlenberg Hosp.*, 306 A.2d 474, 476 (N.J. Super. Ct. App. Div. 1973) (rejecting "captain of the ship" doctrine); North Dakota in *Nelson v. Trinity Med. Ctr.*, 419 N.W.2d 886, 892 (N.D. 1988) (overruled by statute on other

"captain of the ship," which enabled plaintiffs to recover in the face of a hospital's "charitable immunity," is an antiquated doctrine that fails to reflect the emergence of hospitals as modern health care facilities, we decline to adopt it now.

■

¶ 23. The "captain of the ship" doctrine is an outgrowth of the largely defunct "charitable immunity" doctrine, which granted immunity to most hospitals prior to 1940.[12] *See Kojis v. Doctors Hosp.*, 12 Wis. 2d

---

grounds) (limiting "captain of the ship" to cases where the doctor has "direct control" over the nurses actions); Ohio in *Baird v. Sickler*, 433 N.E.2d 593, 595 (Ohio 1982) (refusing to "breathe[ ] new life into that now prostrate doctrine"); Oregon in *May v. Broun*, 492 P.2d 776, 780–81 (Or. 1972) (acknowledging that changes in the operating room have made it impossible for the surgeon to directly supervise all personnel and therefore concluding that "captain of the ship" is no longer viable with the demise of charitable immunity); Tennessee in *Parker v. Vanderbilt Univ.*, 767 S.W.2d 412, 415 (Tenn. Ct. App. 1988) (asserting that the term "captain of the ship" is confusing and unnecessary); Texas in *Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 585 (Tex. 1977) (disapproving of "captain of the ship" as a "false special rule of agency"); and West Virginia in *Thomas v. Raleigh Gen. Hosp.*, 358 S.E.2d 222, 224–25 (W. Va. 1987) (observing that the "majority of states which are now considering the captain of the ship doctrine are rejecting it" and rejecting the doctrine for West Virginia). *See also* Stephen H. Price, J.D., *The Sinking of the "Captain of the Ship": Reexamining the Vicarious Liability of an Operating Surgeon for the Negligence of Assisting Hospital Personnel*, 10 J. Legal Med. 323, 331–47 (1989) (reviewing the abandonment of the "captain of the ship" doctrine in light of a more modern view of the hospital as a health care provider rather than a mere "conduit for delivery of medical services").

[12] Kenneth S. Abraham & Paul C. Weiler, *Enterprise Medical Liability and the Evolution of the American Health Care*

367, 372, 107 N.W.2d 131 (1961) (discarding the "charitable immunity" doctrine in Wisconsin). To provide some form of recovery for plaintiffs in the face of "charitable immunity," the "captain of the ship" doctrine enabled them to hold a doctor liable for the negligence of assisting hospital employees. Courts reasoned that charitable hospitals of the late nineteenth century and early twentieth century lacked the financial wherewithal to survive a negligence action against their employees relative to the doctors who conducted surgery on their premises.[13]

¶ 24.   But now, as numerous commentators have observed, modern health care facilities are in a better position to protect patients against negligence from their employees and insure against the corresponding liability.[14] *See id.* (acknowledging that modern charitable hospitals "are now larger in size, better endowed, and on a more-sound economic basis" and that "[i]nsurance covering their liability is available and prudent management would dictate that such protection be purchased"). Over the last 60 years, hospitals have become increasingly vital facilities for the delivery of health care. We recognized this shift in *Kashishian v. Port*, 167 Wis. 2d 24, 38–39, 481 N.W.2d

*System*, 108 Harv. L. Rev. 381, 385 (1994)(explaining the advent of the charitable immunity doctrine and heralding its demise).

[13] *See* 1 Barry R. Furrow et al., *Health Law* 379 (2d ed. 2000) (recounting that the reasoning supporting charitable immunity was that "a single large judgment could destroy a hospital" and that "[l]iability insurance was not generally available to cover a hospital's risk exposure").

[14] *See* Stephen H. Price, J.D., *The Sinking of the "Captain of the Ship": Reexamining the Vicarious Liability of an Operating Surgeon for the Negligence of Assisting Hospital Personnel*, 10 J. Legal Med. 323, 343–48 (1989).

277 (1992), where we confronted the issue of whether a hospital could be held vicariously liable under the doctrine of apparent authority for the allegedly negligent acts of a doctor working at a hospital as an independent contractor. In so doing, we observed that "[m]odern hospitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are full-care modern health facilities." *Id.* at 38. As full-care modern health facilities, hospitals are no longer " 'mere structures where physicians treated and cared for their patients.' " *Id.* at 42 (citations omitted). We acknowledged the important role hospitals have in our health care system and their advent as full-care modern health care facilities when we stated:

> In essence, hospitals have become big business, competing with each other for health care dollars. As the role of the modern hospital has evolved, and as the image of the modern hospital has evolved (much of it self-induced), so too has the law with respect to the hospital's responsibility and liability towards those it successfully beckons. Hospitals not only employ physicians, surgeons, nurses, and other health care workers, they also appoint physicians and surgeons to their hospital staffs as independent contractors.

*Id.* at 38–39. We recognize the development of the modern hospital as a health care delivery facility and the attendant responsibilities this transition has entailed. Simply put, "captain of the ship" has lost its vitality across the country as plaintiffs have been able to sus-

tain actions against full-care modern hospitals for the negligence of their employees.[15]

¶ 25. Accordingly, we decline to resurrect the anachronistic "captain of the ship" doctrine or create a new theory to enable Lewis to impose vicarious liability on Seldera. Lewis, under the current negligence law in Wisconsin, had a viable cause of action against Lakeland. We are mindful of the harsh consequence Lewis must endure because Lakeland, at the time of the negligent sponge count, was a county hospital and therefore its liability was capped at $50,000, which was insufficient to cover his damages of $150,000. *See* Wis. Stat. § 893.80(3). While this is a troubling deficiency, it is the result of a legislative policy decision, which may be supported by broader considerations.[16] These

---

[15] We also note that the "captain of the ship" doctrine is at odds with the corresponding diminishment of an individual doctor's control of the modern operating room that is caused by increasing specialization and division of responsibility. *See* Stephen H. Price, J.D., *The Sinking of the "Captain of the Ship": Reexamining the Vicarious Liability of an Operating Surgeon for the Negligence of Assisting Hospital Personnel*, 10 J. Legal Med. 323, 340–41 (1989) (discussing the operating surgeon's loss of control over the operating room due to the increase in hospitals providing essential medical services and increasing sophistication and specialization of both medical personnel and equipment, which improves patient care).

[16] In *Sambs v. City of Brookfield*, 97 Wis. 2d 356, 377, 293 N.W.2d 504 (1980), we commented on the need for legislative balancing in the context of caps on liability for municipal governments. There we wrote:

It is the legislature's function to evaluate the risks, the extent of exposure to liability, the need to compensate citizens for injury, the availability of and cost of insurance, and the financial condition of the governmental units. It is the legislature's function to struc-

broader considerations include providing full-care modern health care facilities to service citizens who might otherwise not have access to such a facility.[17] If we circumvented this statute in order to impose liability on Seldera, we would discourage doctors from working at government-owned hospitals because they would incur the liability of the hospital's assisting employees, whom they had no hand in selecting. To attach this nondelegable liability to doctors utilizing government-owned health care facilities would create a disturbing dichotomy between government hospitals and private hospitals, which do not attach such nondelegable liability to doctors utilizing their facilities.[18] Thereby we would induce doctors to practice only at private hospitals, which are liable for the full amount

ture statutory provisions, which will protect the public interest in reimbursing the victim and in maintaining government services and which will be fair and reasonable to the victim and at the same time will be realistic regarding the financial burden to be placed on the taxpayers.

*Id.*

[17] *See* John Danaher, M.D., *Health Care Perform: Constituencies Necessary for Change*, 3 Stan. L. & Pol'y Rev. 155, 157 (1991) (recognizing that the cost of health care for the 37 million Americans who are uninsured is borne predominantly by county hospitals or private hospitals as uncompensated care or charity).

[18] We take judicial notice of the fact that there are currently 156 general and special hospitals in Wisconsin. *General and Special Hospitals Directory, Department of Health and Family Services* (2001). Excluding special psychiatric hospitals, currently there are only three government-owned facilities in Wisconsin at the present time: Memorial Hospital of Lafayette County (*id.* at 12), Rusk County Memorial Hospital (*id.* at 26), and University of Wisconsin Hospital and Clinic Authority (*id.* at 29). Lakeland is now a voluntary nonprofit corporation (*id.* at 14).

of damages a negligent employee may inflict upon a patient.

¶ 26. Of course, patients can hold government-owned health care facilities liable for the negligence of their employees under respondeat superior, but, as noted, the legislature has capped that liability at $50,000 per occurrence. In accordance with principles of judicial restraint, we leave it to the legislature to make any necessary policy adjustments. *See Doering v. WEA Ins. Group*, 193 Wis. 2d 118, 132, 532 N.W.2d 432 (1995) (acknowledging "that drawing lines and creating distinctions to establish public policy are legislative tasks"). Therefore, while recognizing the unfortunate result in this case, we must also remain cognizant of the legislative balancing, which weighs the costs of individual unfairness against the benefits of having government-owned health care facilities where doctors are willing to provide health care to all segments of the population. As a result, we believe it would be short-sighted for this court to engage in judicial lawmaking so that Lewis could impose vicarious liability on Seldera and recover beyond the statutory maximum.

### IV

¶ 27. In conclusion, we hold that Seldera cannot be held vicariously liable for the negligence of Vickery and Chapman under either *Fehrman II* or "captain of the ship."

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 28. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. I agree with the mandate

because this case has come to us on summary judgment based on stipulated facts. I write separately because I am concerned that rules of law might be mistakenly drawn from the broad language in the majority opinion.

¶ 29.  First, it is a mistake for the majority opinion to rely on the "captain of the ship" metaphor. This phrase has taken on various meanings beyond the cases that spawned it.

¶ 30.  The majority opinion defines the "captain of the ship" doctrine merely as a theory of vicarious liability that is "similar to respondeat superior."[1] The majority opinion does not explain precisely what theory of liability it is rejecting when it rejects a "captain of the ship" doctrine.

¶ 31.  "Captain of the ship" cases can be analyzed as applying traditional agency concepts of the surgeon's supervision and control.[2] Let's forget the picturesque language, look at the facts of each case, and apply traditional principles of tort and agency law.[3]

¶ 32.  Second, it is a mistake to conclude from the decision that a surgeon can never be held liable for the negligence of a hospital nurse. This issue is not before

---

[1] See majority op. at ¶ 22.

[2] See, e.g., Franklin v. Gupta, 567 A.2d 524, 537 (Md. Ct. App. 1990) (concluding that a careful analysis of "captain of the ship" cases generally reveals that courts have applied traditional agency concepts).

[3] See Sparger v. Worley Hosp., Inc., 547 S.W.2d 582, 584 (Tex. 1977) (quoting Justice Frankfurter writing that "A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas.").

the court. The majority opinion carefully states what Lewis is and is not contending. In particular, it states that Lewis is not relying on the "borrowed servants" doctrine.[4] The majority opinion's conclusion that "the surgeon cannot be held vicariously liable for the negligence of the two hospital nurses" applies only to the stipulated facts and narrow issues presented in this case.[5]

¶ 33. A surgeon can be vicariously liable for the negligence of hospital nurses if the nurses are under the surgeon's control and supervision. Whether hospital nurses are under the surgeon's control and supervision would ordinarily be a question of fact for the fact-finder. The stipulation is silent about the surgeon's supervision and control of the hospital nurses in the present case. The facts of each case would determine whether the surgeon has exercised supervision or control over the hospital nurses.

¶ 34. Third, it is a mistake to conclude from the decision that a hospital procedure or the administrative code controls the law of negligence or liability.

¶ 35. The majority opinion appears to rely on the hospital procedure that the nurses have responsibility for counting and overseeing the count of laparotomy pads and on the administrative code that the circulating nurse ensures that the counts have been done

---

[4] See majority op. at ¶ 10.

The court of appeals concluded that the surgeon did not employ as borrowed servants those hospital nurses who were negligent. The majority opinion makes no similar declaration. If the hospital nurses were "borrowed employees" of the surgeon, the surgeon was vicariously liable for their negligence. See Borneman v. Corwyn Transp., Ltd., 219 Wis. 2d 346, 580 N.W.2d 253 (1998) (setting forth law of borrowed employees).

[5] See majority op. at ¶¶ 1, 3, 9, 10, 19.

according to hospital procedure to absolve the surgeon from liability. Reference to the hospital procedure and administrative code may be misleading.

¶ 36.  Regardless of what hospital procedure or the administrative code says about a hospital nurse's obligations, a surgeon's failure to exercise supervision and control over hospital nurses might constitute negligence, and the nurses' negligence might then be imputed to the surgeon. Under certain circumstances, a fact-finder might conclude that a surgeon should have, or did exercise, control or supervision. Hospital procedure and the administrative code might constitute customary medical practice, but customary medical practice does not necessarily constitute reasonable due care in an action for medical malpractice.[6]

¶ 37.  Furthermore, an issue raised at oral argument was whether the duty to put in and remove the pads was a nondelegable duty of the surgeon. The concept of nondelegable duty is that the surgeon's duty of due care cannot be delegated and that the surgeon is liable for the negligence of the hospital nurse even though the surgeon has done everything that could be reasonably required of the surgeon. If the duty is nondelegable, the person with the nondelegable duty is

---

[6] The standard of reasonable care for a physician is that degree of care, skill, and judgment that reasonable specialists would exercise in the same or similar circumstances having due regard for the state of medical science at the time the plaintiff was treated. A doctor who fails to conform to this standard is negligent. *See* Wis JI—Civil 1023 (1998). Evidence of the usual and customary conduct of other physicians under similar circumstances is ordinarily relevant and admissible as an indication of what is reasonable care. *See Nowatske v. Osterloh*, 198 Wis. 2d 419, 438, 543 N.W.2d 265 (1996).

vicariously liable.[7] The parties have not briefed or argued this theory of liability, and the majority opinion does not directly address this issue.

¶ 38. For the reasons set forth, I write separately.

¶ 39. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[7] W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 71, at 511–12 (5th ed. 1984).